THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
HENRY HOPKINS, Defendant-Appellant.

First District (3rd Division)   No. 1—90—3309

Opinion filed November 25, 1992.—Rehearing denied February 5, 1993.

Rita A. Fry, Public Defender, of Chicago (Beth I. Solomon and Vicki Rogers, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Barbara Jones, and Michael J. Deno, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Following a bench trial, defendant, Henry Hopkins, was found guilty of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1), aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—14), criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—

13), armed violence (Ill. Rev. Stat. 1987, ch. 38, par. 33A—2), aggravated kidnapping (Ill. Rev. Stat. 1987, ch. 38, par. 10—2), kidnapping (Ill. Rev. Stat. 1987, ch. 38, par. 10—1), aggravated unlawful restraint (Ill. Rev. Stat. 1987, ch. 38, par. 10—3.1), and unlawful restraint (Ill. Rev. Stat. 1987, ch. 38, par. 10—3). Defendant was sentenced to consecutive terms of 60 years' imprisonment for first degree murder and 10 years' imprisonment for aggravated criminal sexual assault. We affirm in part, vacate in part and modify.

The issues before this court for review are: (1) whether defendant's convictions should be reversed because he was denied effective assistance of counsel because his attorney failed to file a pretrial motion to quash his arrest on the basis that the police did not have probable cause to arrest him; (2) whether the trial court erred when it denied defendant's pretrial motion to suppress certain statements made to the police on the basis that the police did not have probable cause to arrest him; (3) whether defendant was proved guilty of first degree murder beyond a reasonable doubt; (4) whether defendant was proved guilty of aggravated criminal sexual assault beyond a reasonable doubt; (5) whether defendant was proved guilty of aggravated kidnapping beyond a reasonable doubt; and (6) whether the trial court abused its discretion when it sentenced defendant to an extended term of 60 years' imprisonment.

Around 1 a.m. on August 6, 1988, Officers Julie Mendez and Edward Kodatt arrived at an apartment building located at 117 South Rockwell in Chicago, Illinois (the building). Upon their arrival, they found an unconscious young woman lying facedown on the ground. The woman was naked from the waist down. The victim was later identified as 13-year-old Toshanda Williams. Officer Mendez determined that the victim had fallen from an open window on the seventh floor.

Officer Mendez then went to the seventh floor of the building and entered apartment number 709, where the open window was located. The apartment was vacant. Officer Mendez found a shoe and a pair of women's pants in one room of the apartment. Upon entering another room in the apartment, Officer Mendez saw bloodstains on the floor and bloody handprints on the wall in the hallway.

As Officer Mendez was leaving the apartment, a little boy, who was later identified as the victim's brother, approached her and told her that defendant was the last person to be seen with the victim. Officer Mendez then went to the eighth floor of the building and questioned the residents concerning defendant's whereabouts. While Officer Mendez was on the eighth floor, she encountered defendant, who

identified himself and talked to her. During the conversation, defendant agreed to visit apartment 709 with Officer Mendez. After defendant and Officer Mendez entered the apartment, Officer Mendez noticed that defendant began to shake and sweat. Upon leaving the apartment, Officer Mendez and her partner drove defendant to the Area 4 police station at Harrison and Kedzie.

After defendant arrived at the police station with Officers Kodatt and Mendez, the police officers left him in an interview room. After escorting defendant to the room, the police officers had no further contact with him.

At approximately 1:30 a.m., Detective Patrick Foley went to the building to investigate the victim's death. Upon observing the area where the victim was found, Detective Foley noticed that there was blood on the grass below an open seventh-floor window and that the window was open because the board covering it had been removed.

Detective Foley then inspected apartment 709. While he was inside of the apartment, he observed that all of the windows were boarded up except for one which was located in the east bedroom. The board covering that window had been removed. Detective Foley also noticed that there was blood on the window sill of the open window and on the floor below the window. Detective Foley found an 8-inch bloodstained piece of wood, a 40-inch stick with blood on it, a pair of blue jeans next to the stick and a shoe next to the blue jeans, two large bloodstains on the wall, bloodstains on the clothes pole in the closet and another shoe in front of the closet. Detective Foley then observed "drag marks" leading from the west bedroom into the hallway and two blood spots directly in line with the open window in the east bedroom.

Detective Foley returned to the Area 4 police station and interviewed defendant at approximately 5 a.m. Prior to interviewing defendant, Detective Foley gave him a beverage and read him his *Miranda* rights. Defendant then agreed to talk to Detective Foley. Detective Foley and defendant talked for 10 minutes during which time Detective Foley asked defendant if he would be willing to take a polygraph test. Defendant consented to take a polygraph examination and Detective Foley left the room. Detective Foley conducted no other interviews with defendant.

At approximately 10 a.m., Detectives Anthony Mannina and Raymond Leuser escorted defendant to the crime lab facility at 11th and State for a polygraph test administered by Officer Robert Tovar. Prior to the polygraph test, Detective Mannina asked defendant if he would like to eat. Defendant, however, indicated that he was not hun-

gry. After the test, Officer Tovar informed Detective Mannina and defendant of the polygraph results. Defendant then told Officer Tovar a different version of what happened between him and the victim. Officer Tovar then informed Detectives Mannina and Leuser about what defendant had said. Defendant was then arrested and returned to the Area 4 police station at approximately 2 p.m. At that time, defendant was read his *Miranda* rights. Defendant was 17 years old on the date of his arrest.

Detective Mannina testified during the trial that upon defendant's return to the Area 4 station, he questioned him for approximately 15 minutes during which time defendant made an oral statement. Detective Mannina testified that after taking defendant's statement, he asked defendant if he wanted food or a beverage and that defendant again declined. At some point during his detention, defendant signed a consent to search form.

Assistant State's Attorney Mary Beth Kinnerk testified that she interviewed several witnesses including defendant. Assistant State's Attorney Kinnerk stated that upon meeting defendant, she asked him if he had been treated well, and he indicated that he had. She also told the court that she asked defendant if he wanted anything to eat and that he indicated that he was hungry. Assistant State's Attorney Kinnerk testified that she ordered food from McDonald's and brought it to defendant when it was delivered to the station. Assistant State's Attorney Kinnerk also testified that she told defendant that she was representing the State and that she read defendant his *Miranda* rights. After defendant indicated that he understood his rights, he and Assistant State's Attorney Kinnerk talked for 45 minutes in the presence of Detective Mannina. Defendant then agreed to make a recorded statement.

At approximately 9 p.m., a court reporter recorded defendant's statement. In that statement, which was later read into evidence, defendant said that the victim told him to meet her in apartment 709. Defendant stated that when he arrived at apartment 709, the victim was there and wearing only a T-shirt. Defendant said that he then stuck his finger into her vagina but that she became angry when he pulled it out. Defendant stated that the victim then hit him in his groin with her knee and began to fight with him. Defendant said that he responded by grabbing a stick and striking the victim's face. Defendant recalled that as he and the victim fought, they moved through the hallway. Defendant stated that the victim grabbed his hair after he and the victim reached the end of the hall. Defendant stated that he then pushed the victim through a window located in

one of the bedrooms. Defendant said that after pushing the victim through the window, he went back to his apartment, changed his clothes and washed the blood from his arm. The court reporter gave a transcript of defendant's statement to Assistant State's Attorney Kinnerk. Assistant State's Attorney Kinnerk then reviewed the statement with defendant. Defendant, Assistant State's Attorney Kinnerk and Detective Mannina then initialled each page of the statement and signed the last page.

In addition to making the above statement in the police station, defendant wrote two letters to his mother describing his involvement with the crime. The first letter reads as follows:

"To Mom: I'm sorry what happened. I don't know what to say. I made a mistake and killed somebody. I don't know what to do. I think I need some help getting over this. That night I was high, didn't know what I was doing. All I can remember I was fighting her, and I pushed her from the 7th floor, June."

The second letter expanded upon the first:

"To Mom: I'm sorry what happened. I don't know what to say about this. I made a mistake and killed somebody. I don't know what to do. I think I need some help getting over—get over with this. That night I was on some drugs and beers. I was high, and I did not know what I was doing. All I can remember I was fighting her and pushing her from the 7th floor window. To me it's just a bad dream."

Prior to trial, defendant moved to quash his arrest and suppress the above statements on the basis that the police did not have probable cause to arrest him. The trial judge denied defendant's motion after a hearing.

At trial, it was stipulated that defendant and the victim had the same blood type. In addition, it was stipulated that the blue shorts and other clothes recovered from defendant had human bloodstains on them. It was also stipulated that if Dr. Robert Kirschner, a deputy Cook County deputy medical examiner, were to testify, he would state that he conducted an autopsy on the victim whereupon he found that the victim suffered numerous abrasions, puncture wounds and stab wounds to her face, chest, back and buttocks. In addition, it was stipulated that Dr. Kirschner would tell the court that the victim died as a result of severe injuries secondary to an assault and associated with a fall from the seventh-floor window.

Defendant testified that during the late evening hours of August 5, 1988, and the early morning hours of August 6, 1988, he was on the porch of an apartment on the eighth floor with James Grissom,

Cornelius Hennings, James Riley, Toshanda Williams, Lolita Stewart and Shannetta Hayes. Defendant stated that he was wearing blue shorts at that time. Defendant testified that he left the porch and went to his apartment, and that Williams was still on the porch at the time he left.

Grissom testified that shortly after 12:30 a.m. on August 6, 1988, he left the porch and went into the hallway on the west end of the building near the stairwell. Grissom testified that at that time, he was returning from his mother's apartment and he saw the back of defendant's head as defendant walked into the hallway. Grissom then went back to the porch where Hennings and Stewart were. Grissom recalled that a short time later, Williams' brother, Andrew Williams, told him, Hennings and Hayes that someone had fallen out of a window. All of them went downstairs and saw the victim lying on the grass.

Defendant testified that he was wearing jogging pants when the police approached him on the eighth floor. Defendant stated that after talking to the police, he was then brought to a police station, placed in an interview room and beaten on three separate occasions by three different police officers and that the third officer to hit defendant caused his nose to bleed.

Defendant further testified that when Assistant State's Attorney Kinnerk arrived, he told her that he was never in apartment 709 during the early morning hours of August 6, 1988, and that he did not kill the victim. Defendant stated that he signed the statement because he was tired of the police beating him and telling him how he committed the crime. He also stated that he wrote two notes to his mother at the direction of Assistant States Attorney Kinnerk. Defendant testified that he did not know that his mother was at the police station and had asked each of the police officers who questioned him whether he could make a telephone call but they refused to allow him to use a telephone.

Defendant's mother, Gracie Hopkins, testified that she arrived at the Area 4 police station around 6 a.m. on August 6, 1988. Ms. Hopkins testified that she asked to see her son upon arriving at the station, and that a policeman told her that she would be able to see him in a short time. Ms. Hopkins further testified that after waiting several hours, she was escorted into a waiting room on the second floor of the police station where she heard defendant scream. Ms. Hopkins said that about 30 minutes after she heard defendant scream, she watched the police escort him to another room and that she then went back to her apartment with a police officer. She told the court

that once she and the policeman arrived at her apartment, she gave the officer a change of clean clothes for defendant and a pair of defendant's soiled blue shorts. Ms. Hopkins stated that the police officer then instructed her to stay home and wait for him to call her there at 5 p.m. Ms. Hopkins testified that she called the police station at 5:15 p.m., at which time she was told that she could not see defendant. Ms. Hopkins told the court that she then went back to the Area 4 police station around 7 p.m. where she waited until 10:30 p.m. to see defendant. Ms. Hopkins testified that when she finally saw defendant, she noticed that his nose was swollen and that he had dried blood in his left nostril.

The trial court concluded that the evidence against defendant was "overwhelming" and it found defendant guilty on all counts. The trial judge concluded that the murder was "heinous and brutal" and sentenced defendant to 60 years' imprisonment for murder and 10 years' imprisonment for aggravated criminal sexual assault, to run consecutively. This appeal followed.

First, defendant maintains that his convictions should be reversed since he was denied effective assistance of counsel because his attorney failed to file a motion to quash his arrest for lack of probable cause. The State maintains that defendant's contention is meritless because the filing of a motion to quash arrest would not have altered the course of the trial since defendant was not arrested until he made inculpatory statements and because the arresting officer had probable cause to arrest defendant even before said statements were made.

The standard of quality for a lawyer's advocacy is that of reasonably effective assistance pursuant to prevailing professional norms. (*Strickland v. Washington* (1984), 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693-94, 104 S. Ct. 2052, 2064-65; *People v. Jenkins* (1991), 209 Ill. App. 3d 249, 259, 568 N.E.2d 122, 129.) The United States Supreme Court held in *Strickland* (466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064) that in order for a defendant to prove that he received assistance from his attorney which was so ineffective as to require reversal of a conviction, the defendant must show that his counsel made errors so grave and his performance was so deficient that he did not function in a manner commensurate with the sixth amendment standard and that these deficiencies so prejudiced defendant as to deprive him of a fair trial with a reliable result. (See *Jenkins*, 209 Ill. App. 3d at 258-59, 568 N.E.2d at 128-29.) Furthermore, in order to establish that defense counsel was deficient, defendant must overcome the strong presumption that the attorney's inaction was the result of his trial strategy. (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d

at 694-95, 104 S. Ct. at 2065; *Jenkins*, 209 Ill. App. 3d at 259, 568 N.E.2d at 129.) Even if a defendant establishes that his attorney's performance was deficient with respect to the sixth amendment standard for effective advocacy, he must still demonstrate that he was prejudiced by defense counsel's error (*Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693-94, 104 S. Ct. at 2064-65; *Jenkins*, 209 Ill. App. 3d at 259, 568 N.E.2d at 129), and that there was a reasonable probability that absent said error, the fact finder would have had a reasonable doubt concerning his guilt. *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69; *Jenkins*, 209 Ill. App. 3d at 259, 568 N.E.2d at 129.

■ In the present case, defendant has failed to show that he was denied effective assistance of counsel by his attorney's failure to move to quash his arrest for lack of probable cause. In the present case, the police had probable cause to arrest defendant. Under the circumstances, even if defense counsel had filed a pretrial motion to quash defendant's arrest, the motion would have been denied. Defense counsel's assistance, therefore, was not ineffective.

Probable cause to arrest a suspect exists when the police have knowledge of facts which would lead a reasonable person to believe that the suspect committed a crime. (*People v. Westbrook* (1992), 262 Ill. App. 3d 836, 847; *People v. Stuckey* (1992), 231 Ill. App. 3d 550, 560, 596 N.E.2d 646, 653; *People v. Erby* (1991), 213 Ill. App. 3d 657, 664, 572 N.E.2d 345, 349.) The inquiry which should be made when determining if probable cause for a warrantless arrest existed at the time of a defendant's arrest is whether a reasonable person in the police officer's position would have believed that the defendant committed a crime. (*People v. Adams* (1989), 131 Ill. 2d 387, 398, 546 N.E.2d 561, 566; *People v. Westbrook* (1992), 262 Ill. App. 3d 836, 847.) Evidence which would not be admissible at trial (such as testimony regarding defendant's performance on a polygraph test in the present case) and which may not establish a defendant's guilt beyond a reasonable doubt could constitute probable cause for his arrest. (See *People v. Johnson* (1989), 187 Ill. App. 3d 756, 771, 544 N.E.2d 392, 401.) Furthermore, if a citizen (Andrew Williams in this case), rather than a police officer provides the police with information establishing probable cause, the police are not required to corroborate said information or establish the reliability of the informer prior to arresting a defendant. See *Johnson*, 187 Ill. App. 3d at 771, 544 N.E.2d at 401.

In the present case, the victim's brother's statement linking her to defendant, defendant's behavior at the scene of the crime and defendant's inculpatory statements made to the police which contra-

dicted information he previously imparted to Officer Tovar during a polygraph test, combined to constitute probable cause for his arrest. The record shows that the police had knowledge of facts which would lead a reasonable person to believe that defendant murdered the victim and a reasonable person in the arresting officer's position would have believed that defendant committed the crime. On the basis of the above facts and the aforementioned case law, we find that the police had probable cause to arrest defendant and that any motion to quash his arrest would have failed.

In addition, a reading of the record shows that defense counsel's strategy was to suppress defendant's confession on the basis that it was involuntary because it was prompted by the misconduct of certain police officers. On the basis of the record, defense counsel's inaction was neither a grave error, nor did it constitute performance deficient in a manner violative of the sixth amendment standard. Defendant has therefore failed to show that he was prejudiced by defense counsel's inaction and that there was a reasonable probability that had defense counsel moved to quash his arrest, the trial court would have had a reasonable doubt with respect to his guilt. Defendant therefore has failed to overcome the presumption that defense counsel's failure to move to quash his arrest was sound trial strategy. Accordingly, defendant's claim of ineffective assistance of counsel must fail and his convictions stand.

Second, defendant contends that the trial court erred in denying his motion to suppress certain statements made to the police because the police did not have probable cause to arrest him and because his statements were involuntary since they were induced by illegal police detention, long periods of confinement, physical abuse by certain police officers, being precluded by the police from communicating with family members and his young age. The State maintains that the trial court's denial of defendant's motion to suppress was proper because there was overwhelming evidence that his confession was made voluntarily.

■ We affirm the trial court's ruling on defendant's motion to suppress. We noted above that the police had probable cause to arrest defendant. We now find that defendant voluntarily confessed to the police.

"Whether a statement is voluntarily given depends upon the totality of the circumstances. The test for voluntariness is whether the statement was made freely, voluntarily and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he confessed." (*People v. Clark* (1986), 114 Ill. 2d 450,

457, 501 N.E.2d 123, 126; *People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, 606.) The voluntary nature of a confession need only be established by a preponderance of the evidence. (*Clark*, 114 Ill. 2d at 457, 501 N.E.2d at 126.) Moreover, a trial court's ruling on a motion to suppress evidence will not be disturbed by a court of review unless the finding is manifestly erroneous. *People v. Foskey* (1990), 136 Ill. 2d 66, 76, 554 N.E.2d 192, 197; *People v. Redd* (1990), 135 Ill. 2d 252, 289, 553 N.E.2d 316, 332; *People v. Westbrook* (1992), 262 Ill. App. 3d 836, 847-48; *People v. Stuckey* (1992), 231 Ill. App. 3d 550, 560, 596 N.E.2d 646, 653.

There is every indication in the record that defendant voluntarily confessed to killing the victim. The police officers who questioned defendant and Assistant State's Attorney Kinnerk testified that they read defendant his *Miranda* rights prior to each interview and at the time of his arrest, and that defendant indicated that he understood his rights each time.

Defendant was not detained by the police illegally nor was he confined for an unreasonable amount of time. Defendant's detention was legal. Defendant voluntarily accompanied Officers Mendez and Kodatt to the Area 4 police station. Defendant was also confined for a reasonable amount of time. Defendant was detained approximately 20 hours before giving a recorded confession. Confessions made after longer periods of detention have been found to have been voluntary. (*People v. Dodds* (1989), 190 Ill. App. 3d 1083, 1090-92, 547 N.E.2d 523, 529-30.) Furthermore, the record shows that defendant was not subjected to long interviews, but was instead questioned for brief intervals with long rest periods between those interviews.

Defendant was not denied basic human necessities during his detention. Defendant was not denied food or water. At 5 a.m. on August 6, 1988, Detective Foley gave defendant a beverage before interviewing him. Defendant was asked on three subsequent occasions whether he wanted any food. Detective Mannina testified that at 10 a.m. and 2 p.m., he asked defendant if he wanted anything to eat but that defendant declined. Assistant State's Attorney Kinnerk testified that she brought defendant food before obtaining his court-reported statement. In addition, there is no evidence that defendant was denied the opportunity to use a bathroom.

Furthermore, there is ample evidence that defendant was not physically or psychologically abused prior to making his confession. Defendant admitted during his testimony that a picture taken at the time he signed his court reported statement showed that his nose was not swollen or bleeding. Three police officers and three detectives tes-

tified that they neither struck defendant nor attempted to overpower defendant's will prior to his confession. In addition, Assistant State's Attorney Kinnerk testified that when she asked defendant in private whether he had been treated well by the police, he replied that he had been treated well and that he had no complaints.

Finally, the presence or absence of a parent is only one factor in determining whether a confession was voluntary within the totality of the circumstances. (*People v. Brown* (1989), 182 Ill. App. 3d 1046, 1051-52, 538 N.E.2d 909, 911-12.) In Illinois, a juvenile does not have a *per se* right to consult with a parent before or during police questioning. *Brown*, 182 Ill. App. 3d at 1052, 538 N.E.2d at 912.

Upon viewing defendant's confession within the totality of the circumstances, we find that the preponderance of the evidence shows that his statement was voluntary, as it was made freely and without compulsion or inducement. Defendant has failed to demonstrate that the trial court's ruling on his motion to suppress was manifestly erroneous. We therefore affirm the trial court's ruling on the motion.

Next, defendant alleges that he was not proved guilty of first degree murder beyond a reasonable doubt. The State maintains that defendant was proven guilty of first degree murder beyond a reasonable doubt because there was overwhelming evidence of his guilt.

Section 9—1(a) of the Criminal Code of 1961 provides:

"§9—1. First Degree Murder ***. (a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another." Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), (a)(2).

The relevant inquiry upon judicial review of the sufficiency of the evidence in a criminal case is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Stuckey* (1992), 231 Ill. App. 3d 550, 566, 596 N.E.2d 646, 657; *People v. Trimble* (1991), 220 Ill. App. 3d 338, 350, 580 N.E.2d 1209, 1216; *People v. Schorle* (1990), 206 Ill. App. 3d 748, 759, 565 N.E.2d 84, 91.) After a defendant in a criminal case has been found guilty, all evidence is to be considered in the light most favorable to the prosecu-

tion upon judicial review. (*Jackson*, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789; *Schorle*, 206 Ill. App. 3d at 758, 565 N.E.2d at 91.) A guilty verdict may not be reversed by a reviewing court unless said verdict is "inconclusive, improbable, unconvincing, or contrary to human experience." *Trimble*, 220 Ill. App. 3d at 350, 580 N.E.2d at 1216; *Schorle*, 206 Ill. App. 3d at 758, 565 N.E.2d at 90.

■■ After considering the evidence in the light most favorable to the prosecution, we find that the trial court's conviction of defendant for first degree murder is neither improbable, unconvincing, inconclusive nor contrary to human experience. Defendant confessed that he was in apartment 709 with the victim, that he fought with her and that he was responsible for her fall from the window. The record also reveals that defendant had blood on his blue shorts. Officer Mendez and Detective Foley both testified that they saw "drag marks" leading from one bedroom into the hallway. Detective Foley further testified that there were two blood spots directly in line with the open window. The trial court was thus provided with evidence from which it could infer that the victim was purposefully dragged to and thrown out of a window. In addition, the autopsy indicates that the victim died as a result of severe injuries secondary to an assault and a fall. Evidence disclosed in the autopsy report combined with the drag marks and blood spots provided the trial court with sufficient evidence that defendant intended to kill or do great bodily harm to the victim, or that he knew that his treatment of the victim would cause her death. Accordingly, we affirm defendant's conviction for first degree murder.

Next, defendant contends that he was not proved guilty of aggravated criminal sexual assault beyond a reasonable doubt. The State maintains that there is overwhelming evidence to support the trial court's finding that defendant was guilty of the offense of aggravated criminal sexual assault. We agree.

An accused commits aggravated criminal sexual assault if he commits criminal sexual assault and any of the following aggravating circumstances existed during the commission of the offense: (1) the accused used a dangerous weapon or any object utilized in such a manner as to lead the victim reasonably to believe it to be a dangerous weapon under the circumstances; (2) the accused caused bodily harm to the victim; or (3) the accused acted in such a manner as to threaten or endanger the life of the victim. (Ill. Rev. Stat. 1987, ch. 38, pars. 12—14(a)(1), (a)(2), (a)(3).) An accused commits criminal sexual assault when he penetrates the victim by force or use of force. (Ill. Rev. Stat. 1987, ch. 38, par. 12—13(a)(1).) "Sexual penetration"

means any intrusion, however slight, of any part of the body of one person or of any object into the sex organ of another person. Ill. Rev. Stat. 1987, ch. 38, par. 12—12(f).

■ In the present case, defendant's conviction for aggravated criminal sexual assault is neither improbable, unconvincing, inconclusive, nor contrary to human experience. The victim in the present case was found naked from the waist down and she suffered trauma to her genitalia. Defendant confessed that he inserted his finger into the victim's vagina. Although defendant maintains that the victim consented to the sexual penetration, the determination of his credibility, the weight to be accorded his testimony and the reasonable inferences to be drawn therefrom are the responsibilities of the trier of fact. (*People v. Furby* (1990), 138 Ill. 2d 434, 455, 563 N.E.2d 421, 430; *People v. Schorle* (1990), 206 Ill. App. 3d 748, 758, 565 N.E.2d 84, 90.) Thus, while defendant maintained that the sexual contact he had with the victim was consensual, it was up to the trier of fact to determine whether defendant's story was credible. We find that there was sufficient evidence for the trial court to determine that defendant committed criminal sexual assault. In addition, there is evidence that the following aggravating circumstances existed at the time of the offense: defendant used a wooden stick in such a manner as to lead the victim to reasonably believe it to be a dangerous weapon; defendant caused bodily harm to the victim; and defendant endangered the life of the victim by throwing her out of a window. After viewing the evidence in the light most favorable to the prosecution, we find that the trial court properly concluded that defendant committed the essential elements of aggravated criminal sexual assault beyond a reasonable doubt.

Next, defendant contends that the evidence did not establish that he was guilty of aggravated kidnapping beyond a reasonable doubt. The State maintains that the trial court's conviction of defendant for aggravated kidnapping was proper. We agree.

A kidnapping is committed when an accused knowingly and secretly confines another against his will. (Ill. Rev. Stat. 1987, ch. 38, par. 10—1(a)(1).) In addition, the crime of aggravated kidnapping is committed where the confinement is accompanied by the infliction of great bodily harm or the commission of another felony upon the victim. (Ill. Rev. Stat. 1987, ch. 38, par. 10—2(a)(3).) Finally, the commission of the crime of kidnapping or aggravated kidnapping may be shown by proof of either the secrecy of confinement or the place of confinement. See *People v. Enoch* (1988), 122 Ill. 2d 176, 194-95, 522 N.E.2d 1124, 1134.

■ Upon considering the evidence in the light most favorable to the prosecution, we find that there was sufficient evidence supporting the trial court's decision that defendant was guilty of aggravated kidnapping beyond a reasonable doubt. Defendant's conviction is neither inconclusive, improbable, unconvincing, nor contrary to human experience. Defendant confessed that he was in the vacant apartment, a secret place of confinement, with the victim. The "drag marks" on the floor of the apartment and the marks on one of the walls of the apartment indicate that the victim was confined there against her will. This secret confinement was accompanied and aggravated by defendant's infliction of great bodily harm upon the victim with a wooden stick. Accordingly, we affirm defendant's conviction for aggravated kidnapping.

Finally, defendant alleges that the trial court abused its discretion when it sentenced him to an extended term of 60 years' imprisonment because it neglected to consider his rehabilitative potential and his lack of a criminal record. In Illinois, the purpose of sentencing is to provide adequate punishment for an offense, to safeguard society from further offenses and to rehabilitate the offender into a useful member of society. (*People v. Odom* (1972), 8 Ill. App. 3d 227, 228, 289 N.E.2d 663, 664.) The adequacy of punishment should determine the minimum sentence and the length of time needed to rehabilitate a defendant should determine the maximum sentence given to an offender. (*Odom*, 8 Ill. App. 3d at 228, 289 N.E.2d at 664.) Among the factors which should be considered in reviewing a sentence are the family relationships of defendant, his past employment, the likelihood of his rehabilitation and his conduct during incarceration before sentencing. *Odom*, 8 Ill. App. 3d at 228, 289 N.E.2d at 664.

■ First degree murder is a felony punishable by a sentence not less than 20 years and not more than 60 years. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1).) In the present case, however, we find that the imposition of a 60-year sentence upon defendant was an abuse of discretion as the court failed to give adequate consideration and weight to defendant's young age, lack of criminal background and potential for rehabilitation. Defendant committed this offense when he was 17 years old, it was his only felony conviction and he has expressed remorse for his actions. Defendant's presentence investigation report shows that he had been steadily employed for several months while attending school. Defendant also expressed a desire to continue his education despite his incarceration.

On appeal, a reviewing court may reduce the punishment imposed upon a defendant by the trial court. (134 Ill. 2d R. 615(b)(4).) For the reasons that we have stated, we affirm defendant's conviction for first degree murder, but we vacate his 60-year sentence for the crime and modify the sentence to 40 years' imprisonment. We affirm defendant's conviction and 10-year sentence for aggravated criminal sexual assault, and we order that his sentence for the offense run consecutive to his 40-year sentence for first degree murder.

Affirmed in part; reversed in part; vacated in part and modified.

TULLY and CERDA, JJ., concur.