SIXTH DIVISION

         FILED: 09/10/99 

No. 1-97-1204

THE PEOPLE OF THE STATE OF ILLINOIS,   )     Appeal from the 

                                                               )    Circuit Court of 

Plaintiff-Appellee,                       )     Cook County.     

                                                                 )

v.                                                      )         

                                                                ) 

DERRICK HARDAWAY,                              )    Honorable 

                                                                )    Daniel J. Kelley 

Defendant-Appellant.                             )     Judge Presiding.

JUSTICE ZWICK delivered the opinion of the court:

  

Following a jury trial, the defendant, Derrick Hardaway, was convicted of first degree murder and sentenced to 45 years in prison.  He now appeals his conviction, arguing: (1) that the trial court improperly denied his motion to quash his arrest and suppress evidence, (2) that the trial court improperly denied his motion to suppress statements, (3) that the juvenile court improperly transferred his case to the adult criminal division, (4) that the trial court's voir dire examination was inadequate, (5) that the trial court improperly denied his motion for a continuance based on pre-trial publicity, and (6) that  the State's rebuttal argument deprived him of a fair trial.  Issues (1) and (2) will be considered in this opinion; issues (3) through (6) will be determined in a separate Supreme Court  Rule 23 order disseminated contemporaneously.  For the reasons which follow, we affirm defendant's conviction.

The 14-year-old defendant and his brother Cragg Hardaway (the 16-year-old codefendant), were charged with the first degree murder of 11-year-old Robert "Yummy" Sandifer (Sandifer).  Because of his age, defendant's case was initiated in Juvenile Court.  Following a transfer hearing, defendant's case was transferred to the criminal division, where he would be tried as an adult.  Prior to separate trials, the trial court conducted a joint hearing on the defendants' motions to quash arrest and suppress statements.  The pertinent evidence at the hearing established the following.

On August 28, 1994, Sandifer, a member of the Black Disciples street gang, shot 14-

year-old Shavon Dean, 16-year-old Kianta Britton and 17-year-old Sammy Seay.  Dean died as a result of her wounds.  An intensive police search for Sandifer ensued and around 12:22 a.m. on September 1, 1994, Sandifer was found under a viaduct in the area of 108th and Dauphin.  Sandifer had been shot twice in the back of the head.  Three empty shell casings were found near his body.

In the early morning hours of that same day, Mrs. Cassandra Cooper phoned the police and told them that Sandifer had been at her home at 10609 S. Edbrooke at approximately 11:30 p.m. the night before.  The Cooper home is 9 blocks from the viaduct where Sandifer's body was found.  Mrs. Cooper told the police that her daughter, Jimesia, saw Sandifer leave the Cooper's porch with Derrick Hardaway and that his brother Cragg was involved.  Shortly after 7 a.m. police took Mrs. Cooper and Jimesia to Area Two.     

Lieutenant Murphy and Detectives Arbataitis and Lane had been assigned to investigate the murder.  After learning that witnesses reported having seen the victim in the company of  defendant and codefendant less than one hour before his death, the three went to the Hardaway home.  At approximately 8 a.m., the detectives arrived and spoke to defendants' father at the door.  After identifying themselves, Lt. Murphy asked whether Derrick and Cragg were home, explaining that the police were investigating the murder of Sandifer, and they had information that his sons were with Sandifer shortly before his murder.  Mr. Hardaway stated that Cragg was not home but that Derrick was home.  He brought Derrick to the police in the living room.  Lt. Murphy told defendant what he had told his father and asked defendant to accompany them to the police station to help with the investigation.  Defendant agreed to go with the officers.  Mr. Hardaway also told defendant to go with the police and see what was going on.  Lt. Murphy told Mr. Hardaway that defendant would be taken to Area Two police headquarters at 727 E. 111th Street and offered Mr. Hardaway a ride if he wanted to accompany his son.  Mr. Hardaway declined, saying he would wait at home for Cragg.  The Hardaways lived about 12 blocks from Area Two.  Detective Arbataitis gave Mr. Hardaway his business card with his and Lt. Murphy's phone numbers.  Derrick left the room unescorted to get dressed and was patted down but was not handcuffed while being transported.  Upon arrival, he was placed in an unlocked interview room. 

Detectives Arbataitis and Lane interviewed defendant shortly after arriving at the station.  Defendant admitted knowing the victim but stated that he had last seen the victim three days previously.   Arbataitis left the interview room and spoke to Jimesia Cooper who was in another interview room.

Jimesia told Arbataitis that she had been sitting on her porch at 10609 S. Edbrooke around 11:30 p.m. the previous evening with Mike Griffin and Sandifer when defendant came out of a gangway and approached the group.  Jimesia had known defendant for several years and he had slept at the Cooper residence on occasion.  Defendant told Sandifer "that he had to go with Derrick, that (Cragg Hardaway) and the boys wanted to take him out of town."  Jimesia then saw Sandifer walk through the gangway toward the alley with Derrick and Mike.

The police knew that defendant and his brother were members of the Black Disciples street gang and lived one block from the Coopers.  Sandifer's body was found at 12:22 a.m..  A canvass of the neighborhood turned up information that shots had been fired in the area of the viaduct at approximately 12:15 a.m., some 45 minutes after Sandifer left with defendant.  

After speaking to Jimesia, Detectives Arbataitis and Lane reentered defendant's interview room.  They again asked defendant when he had last seen Sandifer.  Defendant repeated that he had not seen Sandifer for three days.  Detective Arbataitis then read defendant his 
Miranda
 rights and advised him that he could be tried as an adult.

The detectives confronted Derrick with Jimesia's statements.  Defendant then changed his story.  He told Arbataitis and Lane that at 11:30 p.m. the previous night he was in a car with his brother Cragg when they saw Sandifer on the porch with Jimesia Cooper and Mike Griffin.  Cragg told defendant to go get Sandifer.  Defendant said he walked to the porch and told Sandifer he had to come with him because they were going to get him out of town.  Defendant said that Sandifer and Griffin followed him off the porch and went to the car.  Cragg then drove off with Sandifer.  Defendant walked home as did Griffin.  Arbataitis testified that it was at this point that defendant was no longer free to leave the Area.

Later that same day, Mike Griffin was interviewed and he told the police that defendant had gotten into Cragg's car with Sandifer and defendant refused to give Griffin a ride home because "they were in too deep."

Detective McCann testified that at 4 p.m. he relieved Arbataitis and Lane in the case and he contacted Area Two Youth requesting that a youth officer be assigned to participate in the interview of Derrick.  McCann was told that the shift was just changing and a youth officer would assist McCann shortly.  At approximately 4:30 p.m. McCann entered Derrick's interview room accompanied by Gang Crimes Specialist Oliver.  McCann read defendant his 
Miranda
 rights and advised him that if he was charged he could be transferred from juvenile court and tried and sentenced as an adult.  Defendant repeated his statement of 10:30 a.m..  McCann testified that he then told Derrick that Mike Griffin had said something different.  Derrick told McCann that he did not believe him.  McCann then had Derrick walk down the hall and showed him that Griffin was in another interview room.

Derrick then told McCann and Oliver that he did indeed get into Cragg's car with Sandifer and that he was present when Cragg shot Sandifer under the viaduct shortly thereafter.

During the late morning hours of September 1, other police officers had gone to the Hardaway home looking for Cragg, but he was not home.  Mr. Hardaway promised to call the officers as soon as he heard from Cragg and told the officers that Cragg had a girlfriend named Shanta.

Gang Crimes Specialist Dennis Cullom testified that around 2:30 p.m., he and Officers O'Neill and Jurek, located Shanta's house.  Shanta told the officers that Derrick and Cragg Hardaway had come to her house around 7 p.m., the previous evening.  Cragg later received a page and either Cragg or Shanta called the number which appeared on the pager.  Shanta and her cousin then drove Derrick and Cragg to "Emma's" house in the area of 108th and Perry.  This was at approximately 10:30 p.m., and Shanta did not see them again that night.  The officers took Shanta to the area of 108th and Perry, where she identified Emma's house as the one located at 118 West 108th Place.

Shanta accompanied the three officers to the Hardaway home, where Mr. and Mrs. Hardaway were.  Mrs. Hardaway paged Cragg who called and agreed to return home.  When Cragg arrived, Officer O'Neill explained to him that his brother was at the police station and that witnesses had reported seeing Derrick and Cragg with the victim approximately 45 minutes before he was killed.  Cragg asked to speak to the officers outside his parent's presence, so the three officers accompanied him into the kitchen.  Officer Cullom then advised Cragg of his 
Miranda
 rights and asked him his whereabouts the previous evening.   Cragg told the officers that he had been with Shanta the entire night, at which point Officer Cullom told Cragg "he was a liar" and placed handcuffs on him.  This happened at approximately 5:30 p.m.   Gang Crimes Specialist Cullom also testified that after the shootings by Sandifer on August 28th, the police thought that leaders of the Black Disciples street gang had probably ordered the murder of Sandifer to silence him. 

Assistant State's Attorney Theresa Harney testified that she interviewed Derrick at approximately 7 p.m. on September 1.  She introduced herself to Derrick and also introduced Derrick to Youth Officer Geraci.  Detective McCann was also present for this interview.  Harney read defendant his 
Miranda
  rights and informed him that if he was charged in connection with the murder of Sandifer, he could be tried and sentenced as an adult.  Harney asked defendant to explain to her what the 
Miranda
 rights meant and defendant did so.  Derrick told Harney the same version of events as he gave to McCann earlier.  At 10:45 p.m., defendant gave a court reported statement to Harney in the presence of Geraci and McCann.

Youth Officer Geraci testified that at 6 p.m. on September 1 he was present when Detective Caesar interviewed Cragg Hardaway at Area Two.  At 7 p.m., Geraci met Derrick Hardaway with A.S.A. Harney and Detective McCann.  In Geraci's presence, Harney told defendant that Geraci was a youth officer and that he was present "as an observer to assist (Derrick) if he had any questions or any problems that I could help him with."  Geraci then asked Derrick "if there was anything I could assist him with at that point to which he told me no."  Geraci testified that he was also present when defendant gave the court reported statement at 10:45 p.m. 

A juvenile probation officer testified as to Derrick's prior contacts with the criminal justice system.  Prior to being arrested for the murder of Sandifer, defendant had 12 court referrals for delinquency, three other court referrals adjusted in Complaint Screening and seven station adjustments. 

Mr. Hardaway testified for the defense that he had requested to accompany Derrick to Area Two but the police refused.  He also testified that he and his wife placed two telephone calls to Area Two, one at approximately noon and one at 8 p.m. on September 1 and the police officers who answered the phone refused to allow the Hardaways to speak to Derrick.  Telephone records indicated that two phone calls had been placed from the Hardaway home phone to Area Two consistent with this testimony.

The trial court denied defendant's motion to quash arrest and suppress evidence, finding that the police had probable cause for the arrest.  The trial court also denied defendant's motion to suppress statements, finding that under the totality of the circumstances, the statements were given voluntarily.

A jury was selected.  Defendant raises two issues as to the jury selection which we will address in the separate Supreme Court Rule 23 order.  The State's theory at trial was that the victim, an 11-year-old member of the Black Disciples street gang, had been killed by members of his own gang because he was wanted in connection with several shootings and was bringing intense police pressure on the gang.  The State presented the following evidence.

Through the testimony of two police officers and Sammy Seay, the State established that, on August 28, 1994 Kianta Britton was shot twice in the back at the corner of 108th and Perry.  Britton told police that the victim shot him.  A short time later, 16-year-old Sammy Seay and 14-year-old Shavon Dean were shot in the area of 108th and Wentworth, around the corner from the first shooting.  Seay was shot in the leg and the hand, and Dean died from a gunshot wound to her head.  Seay testified that there was more than one shooter and that he did not see the person who shot him but that others at the scene told him it was the victim.

The police then began looking for the victim.  After learning that the victim was a member of the Black Disciples, the police looked for him in places where members of that gang were known to live or congregate.  One of these places was 118 W. 108th Pl.. The police went to these places on numerous occasions and ran numerous background checks on known gang members in those locations over several days. 

Cassandra Cooper testified that she saw Sandifer on the street in front of her house at 10609 S. Edbrooke at 11 p.m. on August 31, 1994.  She knew that the police were looking for him.  Mrs. Cooper spoke to Sandifer.  Mrs. Cooper testified that she had convinced Sandifer to go to his grandmother and then turn himself in to the police.  Mrs. Cooper then telephoned Sandifer's grandmother, Jannie Fields, and asked her to pick up Sandifer at the Cooper home.  When Mrs. Cooper returned from making this phone call, she saw that Sandifer was no longer on her porch.  Mrs. Cooper saw Sandifer's grandmother drive up in a van but she could not find Sandifer.  Mrs. Cooper testified that she could not sleep that night because of her fear of what would happen to Sandifer.  When she heard that Sandifer had been found murdered, Mrs. Cooper called the police and told them what she knew and that her daughter Jimesia had seen who Sandifer had left with.

Jimesia Cooper testified that at approximately 11:30 p.m. on August 31, she was sitting on her porch with Mike Griffin and Sandifer.  Derrick Hardaway came out of the gangway and walked up to the group.  Derrick told Sandifer that he had to go with him and Cragg because "the boys" wanted to take him out of town.  Jimesia saw Sandifer walk through the gangway toward the alley with Derrick and Mike. 

Officer William Moorman testified that at 12:22 a.m. on September 1, 1994, a pedestrian flagged him down and reported having found the victim's body in the viaduct at 108th between Dauphin and Cottage Grove Avenues.  The victim's death resulted from two gunshot wounds to the head.  A .25 caliber bullet recovered from the victim's body was consistent with three .25 caliber shell casings found at the scene.

Michael Griffin testified that, on August 31, 1994, he was a 14-year-old member of the Black Disciples.  Shortly after 10:30 p.m. that day, he encountered the victim sitting on the porch of an abandoned house at 105th and Edbrooke.  Griffin stopped and talked with the victim, who said he wanted to go home.   Griffin knew a man named Curtis who lived several houses down on Edbrooke and unsuccessfully attempted to have Curtis call a taxi for the victim.  Griffin and the victim then walked to Jimesia's house, which was further down on Edbrooke.  The victim gave Jimesia's mother, Cassandra, his grandmother's telephone number, and Cassandra went down the block to call her.  While Griffin and the victim were sitting on the porch, a light-colored Buick drove down Edbrooke toward 105th.  The driver "looked" like Cragg and Derrick was in the passenger seat.  According to Griffin, both were members of the Black Disciples.  

The car stopped near Curtis' house, and Derrick got out and walked toward the porch.  Derrick told the victim that he would take Sandifer out of town.  Derrick, the victim, and Griffin then walked through a vacant lot toward Indiana Avenue.  When the three reached the alley, Griffin asked Derrick for a ride home, and Derrick said, "We are on something.  We will be too deep."  Griffin stopped in the alley.  Derrick and Sandifer continued walking toward Indiana Avenue, where they got into the same car Griffin had seen earlier.  The driver "looked like" Cragg.

Shanta McGlown testified that Cragg and Derrick Hardaway, both members of the Black Disciples, were at her house around 9 p.m. on August 31, 1994, when Cragg received several pages.  After the first page, Shanta, at Cragg's request, called the number on his pager and asked for Kenny.  The person that answered the telephone said that Kenny did not live there.  Cragg then gave Shanta a different phone number and told her to call it and tell the person who answered to tell Kenny that Cragg was on his way.  Around 10:30 p.m., at Cragg's request, Shanta and her cousin drove Cragg and Derrick to a house around 108th Street and Perry.  She did not see them again that night.  

Gang Crimes Specialist Dennis Cullom testified that he had investigated street gangs on the south side of Chicago for many years.  He testified that Sandifer was a member of the Black Disciples street gang.  Sandifer would be categorized as a "Shorty" - the youngest members of a street gang who would have to take orders from any member of the gang.  Cullom testified that Kenny Stump was a leader of the Black Disciples street gang and he and other members of the gang would often congregate at a home at 118 W. 108th Pl., which is near Perry.  Cullom further testified that twice during the day on September 1, 1994 he had gone to the Hardaway home looking for Cragg.  On both occasions, Cullom asked Mr. Hardaway if he wanted a ride to Area Two to see Derrick.  Mr. Hardaway declined both times, saying he was waiting for Cragg.  Cullom testified that after 3 p.m. he returned to the Hardaway residence a third time.  Mrs. Hardaway then paged Cragg and told him to come home.  Cragg arrived after 5 p.m. and Cullom advised Cragg, in the presence of his parents, that he was investigating the murder of Sandifer earlier that day.  Cullom also told Cragg that witnesses had seen Sandifer with Cragg and Derrick less than an hour before Sandifer was murdered.  After a brief conversation with Cragg, Cullom handcuffed Cragg and took him from the home.  Cullom told Mr. and Mrs. Hardaway that Cragg would be at Area Two, some twelve blocks away. 

Detective Arbataitis testified consistently with his testimony at the suppression hearing, regarding the steps taken in the investigation.  Arbataitis testified that after arriving at Area Two, Derrick admitted that he knew Sandifer but said that he had not seen him in three days.  Arbataitis testified that he then interviewed Jimesia Cooper and at 10:30 a.m. he confronted Derrick with the information that he had learned.  It was at this time that Derrick admitted that he and Cragg saw Sandifer on the Coopers' porch with Mike Griffin and Derrick told Sandifer that he should go with Cragg to get out of town.  No objection was made as to this testimony.

Youth Officer Geraci testified consistently with his testimony at the suppression hearing, as to the circumstances of defendant's oral statement at 7 p.m. and the taking of the court reported statement at 10:45 p.m..  In addition, on cross-examination, Geraci testified that it was his duty to determine whether a juvenile has been abused in any way by the police while being interrogated.  Geraci testified that he observed defendant during these interviews and he did not appear to be intimated or abused in any way.

Detective McCann testified consistently with his testimony at the suppression hearing.  McCann testified that when he interviewed defendant at 4:30 p.m. on September 1, defendant initially repeated the last statement he had given to Detective Arbataitis.  No objection was made as to any of this testimony.  McCann testified that after he confronted defendant with Mike Griffin's statement and showed defendant that Griffin was in the Area, defendant "told me another story."  McCann testified that defendant spoke for approximately twenty minutes.  McCann did not testify as to the contents of this conversation.  Again, no objection was made as to any of this testimony.  McCann testified as to the circumstances of the interview of defendant conducted by A.S.A. Harney in the presence of himself and youth officer Geraci at 7 p.m..

Assistant state's attorney Harney testified consistently with her testimony at the suppression hearing.  In addition to testifying regarding the circumstances of the 7 p.m. interview and the taking of the court reported statement at 10:45 p.m., Harney published that statement to the jury.  Defendant told Harney that on August 31, 1994 Shanta and her cousin had given him and Cragg a ride to a house at 108th and Perry.  There, Kenny Stump told Cragg that he had to get rid of Sandifer.  Derrick knew this meant Cragg was to kill Sandifer.  Derrick said that Cragg told him that Sandifer knew too much about the gang and if the police caught Sandifer, he would probably have cooperated and this would lead to the gang's higher-ups getting charged.  Stump told Derrick that when he saw Sandifer he was to tell him to go with him, that Derrick and Cragg were taking him out of town.  Stump gave Cragg a set of keys to a light-colored Delta 88.  Cragg and Derrick drove to 106th and Edbrooke and Derrick got out of the car in the alley.

Derrick said he knew Sandifer was in that area because he had seen him there earlier that day.  He said he saw Mike and Sandifer.  Sandifer was on a porch.  Derrick said "I called him, he stood up and I said come on, come on.  I fixin to go out of town, so he came."  Derrick said that he, Sandifer and Mike walked toward Indiana Avenue where Cragg was parked.  Mike asked for a ride home, Derrick told him no.  Cragg drove Derrick and Sandifer to a "tunnel" at 108th and Dauphin.  All three got out of the car and Cragg told Derrick to walk down the street to Cottage Grove and look for police.  Derrick did this and returned to the car.  Cragg then drove off to look for police while Derrick stayed with Sandifer under the viaduct.  Cragg returned and took Derrick aside.  He told Derrick to "get in the car, have it running, don't turn your lights on, have the car in neutral, have the passenger door open... You hear a shot, come up-pull up and get me, but I heard three shots before I pulled up and got him."  Derrick said that he believed Cragg had shot and killed Sandifer and that he drove Cragg back to the house at 108th and Perry.

The State rested its case in chief.  Defendant called Sandifer's grandmother Jannie Fields, as a witness.  She testified that she did not remember details about the events of the evening of August 31, 1994.  Defense counsel asked her if she remembered giving a written statement to a law student working for defense counsel.  Mrs. Fields said she had no idea what the statement contained.  Defense counsel read the substance of the statement to the jury for impeachment purposes only.  In the statement, Mrs. Fields stated that on the night of August 31, 1994 she had gone to the Cooper home at the request of Cassandra Cooper.  Upon arrival, she saw Cragg and Derrick Hardaway but did not see her grandson.

Terry Campbell testified that he was a law student and that he took the unsigned statement of Mrs. Fields.  

Mr. Hardaway testified that he had asked the police to let him accompany Derrick to the police station on September 1 but was refused.  He also testified that he and his wife had called Area Two at noon and at 8 p.m. and asked to speak to Derrick but were told by the police that they could not speak to him.

It was stipulated that phone records indicated that a two minute phone call had been made from the Hardaway residence to Area Two at noon and a four minute phone call had been made from the Hardaway residence to Area Two at 8 p.m. on September 1.

Lt. Joseph Murphy testified in rebuttal that he had offered Mr. Hardaway a ride to Area Two when he picked up Derrick on September 1 at 8 a.m..  He further testified that he had allowed Derrick to leave the front room unescorted to get dressed and that Detective Arbataitis gave a business card to Mr. Hardaway which contained Lt. Murphy's phone number.  Lt. Murphy denied ever being told that defendant's parents had phoned Area Two.  

After closing arguments, the jury deliberated and returned a verdict of guilty of first degree murder.  Defendant's subsequent motion for new trial was denied and the court sentenced defendant to 45 years in prison.  This timely appeal followed.

We first address the defendant's contention that the police did not have probable cause to arrest him and that the trial court, therefore, erred in denying his motion to quash and suppress.

Probable cause exists where a reasonable person, possessing the knowledge possessed by the police officer at the time of the arrest, would believe the defendant committed the offense.  
People v. Bobiek
, 271 Ill. App. 3d 239, 241 (1995).  While mere suspicion is insufficient to establish probable cause, proof beyond a reasonable doubt is not required.  
People v. Garrett
, 276 Ill. App. 3d 702, 708 (1995).  Probable cause may be established by facts within the collective knowledge of police officers working together to investigate a crime even if those facts are not within the personal knowledge of the arresting officer.  
People v. Hendricks
, 253 Ill. App. 3d 79, 89 (1993).  In determining whether probable cause existed, the court must be guided by common sense and practical considerations. 
  
People v. Robinson
, 167 Ill. 2d 397, 405 (1995).  In reviewing the trial court's ruling the evidence addressed at trial may be considered and the ruling may be affirmed on any ground in the record.  
People v. Sims
, 167 Ill. 2d 483, 500-01 (1995).  Furthermore, if a citizen (Jimesia and Cassandra Cooper in this case), rather than a police officer provides the police with information establishing probable cause, the police are not required to corroborate said information or establish the reliability of the informer prior to arresting a defendant.  
People v. Hopkins
, 247 Ill. App. 3d 951, 959 (1993).   "In general, we review determination of probable cause de novo, but we will not disturb findings of fact absent clear error and will give due deference to inferences drawn from those facts by the trial court and arresting officers."  
People v. Aguilar
, 286 Ill. App. 3d 493, 497 (1997); citing 
Ornclas v. United States
, 517 U.S. 690 134 L.Ed.2d 911, 116 S.Ct. 1657 (1996); see also 
People v. Kidd
, 175 Ill. 2d 1 (1996).

At the time of the 10:30 a.m. interview of defendant, the police had information that defendant approached Sandifer on the Coopers' porch around 11:30 p.m., telling him that he and Cragg would "get [the victim] out of town."  Sandifer then walked away with defendant.   The next time anyone was known to have seen the victim was when his dead body was found in a viaduct nine blocks away, about 45 minutes later.

The police knew that defendant and his brother were members of the Black Disciples street gang and lived one block from the Cooper home.  The police had a theory that Sandifer's murder had been ordered by leaders of the Black Disciples.  When first interviewed, defendant said he had not seen Sandifer in three days.  The police then spoke again to Jimesia Cooper who confirmed that Sandifer had walked away from her porch with Cragg the night before.  It is at this point that the police say they began treating defendant as a suspect. 

Many factors are relevant to a determination of probable cause, including but not limited to: (1) the proximity of defendant's abode to the scene of the crime; (2) information that defendant had committed a similar offense; (3) whether the nature of the offense was both violent and serious; (4) whether defendant was among the last to see the victim alive; and (5) whether it appears that defendant has made false exculpatory statements or offered differing explanations.  
People v. Hendricks
, 253 Ill. App. 3d 79, 89 (1994).

Here, the defendant lived one block from the Cooper's home, the offense was the most violent and serious imaginable, the defendant was the last person to be seen with the victim alive, and defendant lied about when he last saw the victim.

It has long been the law in Illinois that where the defendant is among the last to see the victim alive, this is a significant factor in determining whether probable cause exists.  In 
People v. Creach
, 79 Ill. 2d 96 (1980), the defendant had been living with the victim periodically in the month prior to her death.  The victim's body had been found at 7 a.m., and the police knew that she had been killed sometime after midnight.  The defendant claimed to have last seen the victim around 1:30 a.m., when he left for Ohio in her car.  The police knew of no one who had seen the victim after that time.  
People v. Creach
, 79 Ill. 2d at 98-99.  Our supreme court found that these facts were sufficient to establish probable cause.  
People v. Creach
, 79 Ill. 2d at 102.  In 
People v. Davis
, 98 Ill. App. 3d 461 (1981), the victim was found dead in her hotel room, which showed no signs of forced entry.  The defendant, a hotel employee, had made two room service deliveries to the victim shortly before her death and was the last person known to have seen her alive.  This court determined that those facts established probable cause for the defendant's arrest.  
People v. Davis
, 98 Ill. App. 3d at 462-64.

When coupled with the defendant making false exculpatory statements or offering different explanations, probable cause is even stronger.  See 
People v. Hopkins
, 247 Ill. App. 3d 951, 959 (1993) and 
People v. Buie
, 238 Ill. App. 3d 260, 268 (1993).

Defendant argues that defendant was not arrested at the time of his interview at 10:30 a.m. but rather when the police picked him up at his parent's home at 8 a.m. on September 1.  To determine whether an arrest has occurred, we must consider whether a reasonable person would have considered himself arrested  or free to leave, the intent of the officer and the understanding of the arrestee, and whether the defendant was told he was free to leave or that he was under arrest.  
People v. Taggart
, 233 Ill. App. 3d 530, 550 (1992).

Here, the trial court found that defendant consented to accompany and cooperate with the police.  This determination is a factual matter to be decided by the trial court and its determination will not be reversed unless clearly unreasonable.  
People v. DeHoyos
, 172 Ill. App. 3d 1087, 1093 (1988).   Here, the court's finding is supported by the uncontested evidence that the defendant was allowed to leave the front room unaccompanied to get dressed, was not placed in handcuffs and was not read his 
Miranda
 rights before 10:30 a.m..  Even after arriving at the police station, defendant was placed in an unlocked interview room, the door was almost always open, defendant was not handcuffed, photographed or fingerprinted.  All of these factors negate the idea that defendant was under arrest prior to 10:30 a.m..  
People v. Torres
, 283 Ill. App. 3d 281, 288 (1996).

It should also be noted that during his 10:30 a.m. statement, while defendant's statement was exculpatory as to the murder of Sandifer, defendant admitted he told Sandifer that he and Cragg were going to "get [the victim] out of town."  This statement comprised an admission to the offense of obstructing justice, a Class 4 felony.  See 720 ILCS 5/31-4 (b)(West 1996).

The record shows that the police had knowledge of facts which would lead a reasonable person to believe that defendant participated in the murder of the victim and a reasonable person in the arresting officer's position would have believed that defendant had participated in the crime.  On the basis of the above facts and the aforementioned case law, we find that the police had probable cause to arrest defendant and the trial court correctly denied the motion to quash and suppress.

We next address defendant's argument that his statements were not voluntarily made in that defendant was subject to interrogation "without prior counseling by a parent or a youth officer."

Section 5-6 (2) of the Juvenile Court Act provides:

"(2)  A law enforcement officer who takes a minor into custody 

without a warrant under Section 5-5 shall, if the minor is not released, 

immediately make a reasonable attempt to notify the parents or other 

person legally responsible for the minor's care or the person with whom 

the minor resides that the minor has been taken into custody and where 

the minor is being held; and the law enforcement officer shall without 

unnecessary delay take the minor to the nearest juvenile police officer 

designated for such purposes in the county of venue or shall surrender

the minor to a juvenile police officer in the city or village where the 

offense is alleged to have been committed." 705 ILCS 405/5-6 (West 1992). 

On appeal, defendant concedes that the police notified his parents where he was being taken to and why he was being questioned.  Defendant contends that the failure to have a youth officer present for interviews at 10:30 a.m. and 4:30 p.m. made those statements involuntary.  Defendant further contends that even if defendant's parents had purposely not accompanied defendant to the police station, the State was still required to see that defendant was able to be "counseled" by a "concerned" or "interested" adult and that the mere presence of youth officer Geraci during defendant's 7 p.m. interview and the taking of his court reported statement at 10:45 p.m. was not sufficient to make these statements voluntary.

A reviewing court does not reweigh the evidence when deciding whether the trial court properly denied a motion to suppress - a motion to suppress will be reversed on appeal only when it is shown that the trial court's determination was against the manifest weight of the evidence.  
People v. Brown
, 169 Ill. 2d 132, 144, 661 N.E.2d 287 (1996).  Each case must be evaluated based on its own particular set of circumstances.  
People v. Bernasco
, 138 Ill. 2d 349, 562 N.E.2d 958 (1990).

Juvenile defendants are protected by the privilege against self-incrimination, and the burden rests with the State to show by a preponderance of the evidence that a confession was knowingly and intelligently given.  
People v. Anderson
, 276 Ill. App. 3d 1, 6, 657 N.E.2d 57 (1995).  Courts scrutinize custodial interrogation of juvenile suspects with particular care, given that the potential for coercion is enhanced.  
In re J.E.
, 285 Ill. App. 3d  965, 974, 657 N.E.2d 156 (1996).  A confession will be admissible only if it was made freely and voluntarily and if no direct or implied promises were made or improper influence applied.  
People v. Fuller
, 292 Ill. App. 3d 651, 653, 686 N.E.2d 6 (1997).  Even when a juvenile is concerned, however, a court looks to the totality of the circumstances to determine whether a confession is voluntary.  
People v. McNeal
, 298 Ill. App. 3d 379, 390, 698 N.E.2d 652 (1998).

Factors to be considered when determining voluntariness are: the defendant's age, education, intelligence, experience, and physical condition; the duration of the questioning; whether he was advised of his constitutional rights; whether he was subjected to any threats, promises, or physical or mental coercion; and whether the confession was induced by police deception.  
People v. Oaks
, 169 Ill. 2d 409, 447, 662 N.E.2d 1328 (1996).

For a juvenile there are some additional considerations: the time of day when questioning occurred and the presence or absence of a parent or other adult interested in the minor's welfare.  
People v. McNeal
, 298 Ill. App. 3d at 391.  The benchmark for voluntariness is not whether the defendant would have confessed in the absence of interrogation but rather, whether the defendant's will was overborne at the time of the confession.  
People v. Brown
, 169 Ill. 2d at 144. 

Defendant argues that the police prevented defendant from consulting with his parents when they allegedly refused to allow Mr. Hardaway to accompany his son when he was picked up at 8 a.m..  The trial court resolved this issue of fact against defendant after lengthy testimony and we will not substitute our reasoning for that of the trial court.  
People v. Brown
, 169 Ill. 2d at 144. 

We next address defendant's assertion that the absence of a youth officer for defendant's 10:30 a.m. and 4:30 p.m. statements made those statements involuntary and therefore inadmissible.  As to defendant's statement of  10:30 a.m., while Detective Arbataitis did testify to the contents of this statement to the jury, no objection was made by defense counsel.  Both an objection at  trial and a written post-trial motion raising the issue are necessary to preserve an issue for review and failure to do both results in a waiver of the issue on appeal.  
People v. Enoch
, 122 Ill. 2d 176 (1988).  The substance of defendant's 10:30 a.m. statement was that his brother Cragg drove off with Sandifer leaving defendant behind.  The defense used this statement to infer that Cragg was responsible for the victim's murder, not defendant.  We find that the issue of the  admissibility of the 10:30 a.m. statement has been waived.

As to the admissibility of defendant's 4:30 p.m. statement, no one testified before the jury as to the contents of this statement.  Detective McCann testified at trial that after he showed defendant that Mike Griffin was in Area Two, he talked with defendant for about 20 minutes, during which "he told me another story."  Again, this was without objection by defense counsel.  We therefore hold that this issue has been waived on appeal.  
People v. Enoch
, 122 Ill. 2d at 176.

We next address defendant's assertion that youth officer Geraci failed to perform his duties to protect defendant's welfare prior to any interrogation.  Defendant cites the recent case of 
In re J.J.C.
, 294 Ill. App. 3d 227 (2nd Dist. 1998), as requiring proof that a youth officer "affirmatively protected" a juvenile defendant's rights before a court can find that the presence of the youth officer at the confession satisfied the "preconfession counseling requirement."

Geraci testified both at the motion to suppress and at trial.  He testified that A.S.A. Harney introduced him to defendant, said he was a youth officer, Geraci explained to defendant that he was there to do anything he could do for him, that is why he was there.  He testified that, in his presence, A.S.A. Harney read defendant his 
Miranda
 rights and juvenile warnings and had defendant explain them back to her.  He testified that he had been told that other officers had told him that defendant's parents had been told where defendant was and had declined to come to Area Two.  He testified that he was present throughout the 7 p.m. interview and 10:45 p.m. court reported statement and that defendant was never mistreated in any way and that defendant never indicated that he needed anything or wished to speak to his parents.  Geraci testified that defendant was in an interview room and was not handcuffed.  We find that the actions of youth officer Geraci are distinguishable from the inaction of the youth officers in 
In re J.J.C.
, 295 Ill. App. 3d 227, or the cases which have followed 
In re J.J.C.
, 
In re L.L
., 295 Ill. App. 3d 594 (1998) and 
In re G.O.
, 304 Ill. App. 3d 719 (1999).

Although the presence of a youth officer does not per se make a juvenile's confession voluntary, it is a significant factor.  
People v. Fuller
, 292 Ill. App. 3d 651, 667 (1997), citing    
In re Lashun H
., 284 Ill. App. 3d 554, 557 (1996).  In 
Fuller
, this court found that while the defendant's first confession made in the absence of a youth officer was inadmissible, the second confession, made in the presence of a youth officer, was admissible.  The actions of the trial court in the instant case were in conformance with the holding of 
Fuller
 even though 
Fuller
 had not been decided at the time of trial.

In ruling on the motion to suppress, the trial court indicated that the lack of a youth officer's presence was a factor it weighed against the State but that under the totality of the circumstances, the statements were voluntarily given.  The court made a lengthy finding of fact and discussed the relevant case law.  Based on the record and the aforementioned case law, we cannot say the trial court's ruling admitting defendant's 7 p.m. statement and the court reported statement was against the manifest weight of the evidence.

The foregoing discussion reveals no bases upon which to disturb the circuit court's refusal to quash defendant's arrest and suppress his statements.  Accordingly, the court's ruling is affirmed.

Affirmed.

BUCKLEY, and QUINN, JJ., concur.