In the

# United States Court of Appeals
### For the Seventh Circuit

No. 01-3450

DERRICK HARDAWAY,

*Petitioner-Appellee,*

*v.*

DONALD S. YOUNG, Warden,

*Respondent-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 3963—**Milton I. Shadur**, *Judge.*

ARGUED NOVEMBER 26, 2001—DECIDED SEPTEMBER 11, 2002

Before ROVNER, DIANE P. WOOD, and WILLIAMS, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* At the age of 14, Derrick Hardaway confessed under police questioning to the murder of 11-year-old Robert Sandifer. An Illinois trial court denied Hardaway's motion to suppress his confessions as involuntary, and he was convicted of the crime and sentenced to 45 years in prison. After exhausting his state court remedies, Hardaway filed a petition for a writ of habeas corpus. The district court granted the petition, finding that in light of Hardaway's age, the lack of a friendly adult presence, and the length of the interrogation, Hardaway's confession was involuntary and suppression was required. Because we reluctantly conclude that the Illi-

nois courts' application of the totality of the circumstances test to Hardaway's confession was not an unreasonable application of clearly established Supreme Court precedent, we reverse the judgment of the district court. We do so, however, with the gravest misgivings and only in light of the stringent standard of review that applies under the applicable law, because we are convinced that the many other indicia under Illinois law of the special care that must be exercised with children as young as 14 strongly suggests that an injustice was committed here.

**I**

On August 28, 1994, 11-year-old Robert "Yummy" Sandifer, a member of the Black Disciples street gang in Chicago's Roseland neighborhood, shot and killed 14-year-old Shavon Dean and wounded two other children. Sandifer himself then disappeared. An intensive police search for Sandifer ensued until Sandifer's body was found under a viaduct at 108th Street and Dauphin Avenue shortly after midnight on September 1. He had been shot twice in the back of the head.

In the early morning hours of September 1, Cassandra Cooper telephoned the police and told them that Sandifer had been at her home around 11:30 p.m. the night before and that her daughter Jimesia saw Sandifer leave their porch with Hardaway and his older brother Cragg. At around 8 a.m., the police went to the Hardaway home. Hardaway was roused from sleep, told of the investigation, and, after conferring with his father, agreed to accompany the officers to the police station to help with the investigation. Hardaway's father was offered a ride to the station but declined, choosing instead to wait for his son Cragg to return home. Hardaway dressed and was transported to the police station unhandcuffed and placed in an unlocked interview room at about 8:30 a.m.

Two detectives, Robert Lane and Romas Arbataitis, questioned Hardaway at that time. Hardaway admitted to knowing Sandifer but stated that he had last seen him three days earlier. The detectives then left the interview room and Arbataitis spoke to Jimesia, who confirmed her mother's report that Sandifer and Hardaway had been together that very night. Jimesia said that Hardaway had approached Sandifer and another boy, Mike Griffin, who were both sitting on the porch of her home, and told Sandifer "that he had to go with Derrick, that [Cragg] and the boys wanted to take him out of town."

At about 10:30 a.m., the detectives interviewed Hardaway for a second time. This time they read him his *Miranda* rights and confronted him with Jimesia's statements. Hardaway then changed his story, essentially admitting to Jimesia's version of events. He said that Sandifer and Griffin followed him off the porch and went to a waiting car, driven by Cragg. Cragg then drove off with Sandifer while Hardaway and Griffin walked home. The detectives' conversation with Hardaway lasted about 15 minutes and he was then left alone in the interview room. Over the next six hours he was briefly questioned on matters such as the name of Cragg's girlfriend, provided with lunch, and occasionally checked on. Most of his time, however, was spent alone.

During the afternoon, Griffin was located and interviewed by the police. He confirmed that he and Sandifer walked to Cragg's car but stated that Hardaway had gotten into the car with Sandifer and that the brothers had refused to give Griffin a ride home because "they were in too deep." At 4:30 p.m., two new detectives, John McCann and James Oliver, reiterated the *Miranda* warnings and then interviewed Hardaway, who repeated his story. McCann informed Hardaway that Griffin had said something different and walked him down the hall to show him that Griffin was in another interview room. At

that point, Hardaway admitted that he did get into Cragg's car with Sandifer and that he was present when Cragg shot Sandifer under the viaduct shortly thereafter.

Questioning then ceased while an Assistant State's Attorney, Theresa Harney, and a youth officer, James Geraci, were contacted. At approximately 7:00 p.m., McCann, Harney, and Geraci met with Hardaway. Harney told Hardaway that Geraci was a youth officer and that he was present as an observer and to assist Hardaway if he had any questions or problems. Geraci then asked Hardaway if there was anything he could assist him with, to which Hardaway responded no. From that point onward, Geraci did absolutely nothing to assist Hardaway. Harney read Hardaway his *Miranda* rights yet again and informed him again that he could be tried as an adult. Hardaway then explained his rights back to Harney in his own words, stating that he did not have to speak with Harney if he didn't want to, that anything he told Harney she could tell a judge in a trial against him, that he could have an attorney there when he was questioned about the case, even if he or his family couldn't pay for one, and that his case could be moved out of juvenile court to adult court if the judge decided.

Hardaway gave a statement to Harney in which he again confessed to the crime and then agreed to repeat the statement to a court reporter. Another break was taken until the court reporter arrived at 10:45 p.m. At that time, Hardaway admitted that he and Cragg had been ordered by the leader of the Black Disciples to get rid of Sandifer, that he approached Sandifer on the Coopers' porch and brought him back to Cragg's car, that he accompanied Cragg and Sandifer to the viaduct, and that he watched out for police while Cragg shot Sandifer.

The state courts found that Hardaway's parents never tried to come to police headquarters to see their son, and

Hardaway never asked for his parents or for an attorney. He was not physically abused or threatened by the detectives in any way. Hardaway had 19 previous arrests for charges including robbery, attempted criminal sexual assault, unauthorized use of a weapon, and delivery of a controlled substance, but he had never faced anything as serious as a murder charge. He had appeared in juvenile court with appointed counsel on seven occasions; there is no evidence, however, whether he had ever been advised of his *Miranda* rights on those occasions, and it appears that he had little or no experience in the adult criminal justice system.

Hardaway moved to suppress his confession. The trial court denied the motion, finding that the police had never prevented Hardaway from seeing his parents or an attorney; that a youth officer was present to assist Hardaway at his last two confessions; that there were no threats or abuse; that there was no evidence Hardaway suffered from any mental incapacity or handicap; and that he was already more familiar with the criminal justice system and with attorneys than most ordinary adult citizens would be in light of his numerous prior court referrals. It therefore found the confession to be voluntary under the totality of the circumstances. The Illinois Appellate Court affirmed and the Illinois Supreme Court denied review, leading to this timely petition for a writ of habeas corpus.

## II

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254, governs the grant of a writ of habeas corpus here, because Hardaway's petition was filed after the effective date of that statute. Before a writ may issue, a federal court must find that the challenged state court decision is either "contrary to" or "an

unreasonable application of" clearly established federal law as determined by the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000). The district court found (and Hardaway here concedes) that the decision to admit the confession was not contrary to clearly established federal law; it instead focused on the unreasonable application inquiry. "A state court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision 'involv[ing] an unreasonable application of . . . clearly established Federal law.'" *Id.* at 407-08. A state court decision must be more than incorrect from the point of view of the federal court; AEDPA requires that it be "unreasonable," which means something like lying well outside the boundaries of permissible differences of opinion. *Id.* at 411. We review the findings of both the state and district court "*de novo* but with a grant of deference to any reasonable state court decision." *Anderson v. Cowan*, 227 F.3d 893, 897 (7th Cir. 2000).

The voluntariness of a confession, whether made by a juvenile or an adult, is evaluated on the basis of the totality of the circumstances surrounding that confession. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *Fare v. Michael C.*, 442 U.S. 707, 725 (1979). In juvenile cases, the totality approach requires an "evaluation of the juvenile's age, experience, education, background, and intelligence" as well as the circumstances regarding the confession. *Fare*, 442 U.S. at 725. The Supreme Court in the past has spoken of the need to exercise "special caution" when assessing the voluntariness of a juvenile confession, particularly when there is prolonged or repeated questioning or when the interrogation occurs in the absence of a parent, lawyer, or other friendly adult. *In re Gault*, 387 U.S. 1, 45 (1967); *Gallegos v. Colorado*, 370 U.S. 49, 53-55 (1962); *Haley v. Ohio*, 332 U.S. 596, 599-601 (1948). In this case, the trial court correctly recognized that it was re-

quired to apply a totality of the circumstances analysis and also stated, "I do realize and I do take into consideration that the defendant is a juvenile. And that this court must take great care to insure that the admission was voluntary." The Illinois Appellate Court also stated that it would scrutinize the juvenile confession "with particular care." *People v. Hardaway*, 718 N.E.2d 682, 693 (Ill. App. Ct. 1999). Notwithstanding these protestations, the district court found that the analysis of both state courts was an unreasonable application of the totality of the circumstances test in light of *Haley, Gallegos*, and *Gault*, and it therefore issued the writ.

The district court had good reason for doing so, in that it relied on several Supreme Court decisions that had held that the Fifth Amendment rights of a juvenile had indeed been violated. In *Haley*, a 15-year-old boy was arrested at midnight and interrogated for five straight hours by six officers in relays of one or two officers at a time. At 5 a.m., after being falsely told that two other boys had implicated him, the defendant confessed. *Haley*, 332 U.S. at 598. He was then held for three more days before being charged while his mother and an attorney she had retained were rebuffed in attempts to see him. *Id.* The Supreme Court found this confession involuntary because "[t]he age of petitioner, the hours when he was grilled, the duration of his quizzing, the fact that he had no friend or counsel to advise him, the callous attitude of the police towards his rights combine to convince us that this was a confession wrung from a child by means which the law should not sanction." *Id.* at 600-01. Hardaway's case is less egregious, in that there were no efforts to keep his parents away or to confront him with false testimony, and he was held for less than one day rather than three. There were also lengthy breaks in the interrogations, rather than the five grueling hours that Haley was forced to endure.

*Gallegos*, in contrast, is closer to the mark. In that case, a 14-year-old boy was arrested on assault and robbery charges; he "immediately" admitted to the crime. *Gallegos*, 370 U.S. at 50. After his arrest, he was locked for five days in juvenile hall, where his mother was not permitted to see him. He signed a full and formal confession at the end of the week. During that time, he never asked to see his parents or an attorney. The Court admitted that there was no prolonged questioning or use of fear to break down the defendant, but it found that under "the totality of the circumstances" the five-day detention and refusal to permit the boy's mother to see him gave the case an "ominous cast." *Id.* at 54. It concluded that "a 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police . . . . He would have no way of knowing what the consequences of his confession were without advice as to his rights—from someone concerned with securing him those rights." *Id.* The Court therefore found that the formal confession had to be suppressed. *Id.* at 55.

In many respects, this case is quite similar to *Gallegos*. Like Gallegos, Hardaway was only 14 at the time of his arrest. He was questioned for a longer time than Gallegos before his first confession, and no friendly adult was present to explain his rights to him until many hours later (even if we assumed that the passive Geraci served that function). Thus, reading the *Gallegos* decision in isolation, we would likely affirm the district court's judgment.

Later decisions, however, indicate that the mere absence of a friendly adult is by itself insufficient to require suppression of a juvenile confession. In *Fare*, the Supreme Court held that a totality of the circumstances analysis was adequate "to take into account those special concerns that are present when young persons, often

with limited experience and education and with immature judgment, are involved." 442 U.S. at 725. Turning to the specific facts of the case before it, the Court found voluntary the confession of a 16-year-old with a prior criminal record and no signs of insufficient intelligence who had been subjected to no threats, intimidation, or trickery, despite the absence of a friendly adult. *Id.* at 726-27. Since *Fare* was decided, *Gallegos* has been cited just twice by the Supreme Court, both times as support for a "totality of the circumstances" or "compound influence" analysis to analyzing the voluntariness of confessions. See *Dickerson v. United States*, 530 U.S. 428, 434 (2000); *Miller v. Fenton*, 474 U.S. 104, 116 (1985).

The Illinois state courts knew that they were supposed to apply a totality of the circumstances approach when evaluating Hardaway's claims, and they claimed to have done so. The district court agreed that the state courts used the correct test (and thus were not acting "contrary to" applicable law), but that they did so unreasonably by failing adequately to consider three factors: Hardaway's age; the *de facto* absence of a friendly adult; and the length and nature of the interrogation.

Age is clearly a relevant factor in this case, as it is in many areas of the law. Children under the age of 16 are treated differently from adults under Illinois law in a host of different ways. They may not marry, 750 ILCS 5/208, vote, 10 ILCS 5/3-1, serve on a jury, 705 ILCS 305/2, or make a will, 755 ILCS 5/4-1. Restrictions are placed on their ability to work, 820 ILCS 205/1, to smoke, 720 ILCS 675/1, to operate a motor vehicle, 625 ILCS 5/6-107, to withdraw from compulsory education, 105 ILCS 5/26-1, and to travel outdoors between midnight and 6:00 a.m., 720 ILCS 555/1. They cannot purchase airline tickets, 720 ILCS 5/10-8, consent to medical care, 410 ILCS 210/1, attend a raffle, 230 ILCS 15/4, or pierce their bodies, 720 ILCS 5/12-10.1, without parental permission. See also *United*

*States v. Shannon*, 110 F.3d 382, 386 (7th Cir. 1997) (noting various state limitations on ability of minors to consent to sexual activity with adults). It is thus somewhat incongruous that the state of Illinois believes that children, in whose decisions the state has so little confidence in other areas, should be subjected to questioning for major crimes they are suspected of having committed without the continuous presence and assistance of a friendly adult.

The Constitution too affords children rights that cannot always be equated with those of adults. See, *e.g.*, *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 74 (1976); *Gault*, 387 U.S. at 13. Constitutional distinctions between minors and adults are recognized for three reasons: "the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing." *Bellotti v. Baird*, 443 U.S. 622, 634 (1979). Thus, children may be required to consult with a parent or other friendly adult before obtaining an abortion, *id.* at 640, and they may in some circumstances be tried in juvenile court proceedings without a jury trial or certain other precautions, but also without risk of the imposition of adult punishments, to be served in adult institutions. *McKeiver v. Pennsylvania*, 403 U.S. 528, 545 (1971), *Gault*, 387 U.S. at 30.

The difficulty a vulnerable child of 14 would have in making a critical decision about waiving his *Miranda* rights and voluntarily confessing cannot be understated. Indeed, Hardaway argues that we should interpret *Gallegos* to impose a *per se* rule that no child under the age of 16 may waive his rights or make a voluntary confession without a parent or guardian present. We consider this an extremely close question, but we conclude in the end that we are foreclosed from pursuing that path. In the first place, the *Fare* decision, decided nearly two decades after *Gallegos*, makes quite clear that all juvenile

confessions are to be assessed under the totality of the circumstances standard, and that no one factor will be dispositive. *Fare*, 442 U.S. at 725-27.

Since the defendant in *Fare* was 16, it might be possible to impose a *per se* rule at a lower age, such as 14, or 10, or 5. Some state laws, such as those regarding employment, marriage, and operation of a motor vehicle, routinely make distinctions between those over and under age 16, and the Supreme Court has recognized such a distinction as a constitutional matter under the Eighth Amendment in regard to the death penalty. Compare *Stanford v. Kentucky*, 492 U.S. 361 (1989) (upholding execution of 16-year-old) with *Thompson v. Oklahoma*, 487 U.S. 815 (1988) (prohibiting execution of 15-year-old). But there is no support in clearly established Supreme Court precedent for extending this isolated example to the Fifth Amendment context. Even *Gallegos* relied heavily on the "compound of . . . influences" and "totality of circumstances," including the failure to notify the defendant's mother, the length of his detention, and the failure to bring him timely before a juvenile court judge, rather than on age alone. *Id.* at 55. Also cutting against a *per se* rule (at least as to children of Hardaway's age) is the fact that this court has itself upheld on habeas review a murder conviction based on the uncounseled confession of a 14-year-old. *Johnson v. Trigg*, 28 F.3d 639, 642 (7th Cir. 1994). Although we may not apply a *per se* rule, youth remains a critical factor for our consideration, and the younger the child the more carefully we will scrutinize police questioning tactics to determine if excessive coercion or intimidation or simple immaturity that would not affect an adult has tainted the juvenile's confession. *Id.* at 642.

Keeping Hardaway's extreme youth in mind, we turn to the second factor in our analysis: the fact that there was no friendly adult presence to guard against undue police

influence. Hardaway's parents chose not to come to the station with him, and he never requested an attorney. The state courts did note that Youth Officer Geraci was present at the 7:00 and 10:45 p.m. statements, but we agree with the district court that this fact is meaningless. As far as the record shows, Geraci provided about as much assistance to Hardaway as a potted plant. (Although it is true that Geraci might have served as a substitute for a videotape, there is no assurance that he would have been as reliable as a tape, even acknowledging that tampering is a risk with tapes. Tampering of a sort can also happen with live witnesses, either unintentional or intentional: a person is subject to memory lapses, and could even have an incentive to support the police version of events.) When Geraci first entered the room he informed Hardaway that he was there to help him and would assist him if he had any questions. There is no difference between this statement and what any other police officer, such as the "good cop" in a good cop/bad cop routine, might say to a suspect. The fact that Geraci then remained mute while Harney and McCann questioned Hardaway at length further shows he was doing little more than fulfilling the minimum requirements imposed by state law. We wish to make it clear that a state-provided youth officer who functions as nothing more than an observer will not be considered a friendly adult presence for purposes of the totality of the circumstances test. *Cf. People v. McDaniel*, 762 N.E.2d 1086, 1097-98 (Ill. App. Ct. 2001) (reversing conviction under state law where youth officer took no interest in protecting defendant's welfare).

Despite this fact, the absence of a friendly adult at Hardaway's confession cannot be deemed dispositive. "[N]either federal statutory nor constitutional law requires that a juvenile's parents be notified prior to obtaining a confession." *Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996). Even refusing a child's request to have a parent or other

friendly adult (other than a lawyer) present is not enough to suppress the confession if other factors indicate that the confession was voluntary, and Hardaway made no such request here. *Fare*, 442 U.S. at 718; *United States ex rel. Riley v. Franzen*, 653 F.2d 1153, 1162-63 (7th Cir. 1981). However, "in marginal cases—when it appears the officer or agent has attempted to take advantage of the suspect's youth or mental shortcomings—lack of parental or legal advice could tip the balance against admission." *United States v. Wilderness*, 160 F.3d 1173, 1176 (7th Cir. 1998); see also *Johnson*, 28 F.3d at 644-45 (finding interrogation of 14-year-old while mother was also being held in custody did not violate the Due Process Clause).

We therefore must operate under the following procedural framework: the mere fact that Hardaway was 14 and questioned without an adult present does not by itself render his confession involuntary, but it does require that a court conduct a searching review of the facts to ascertain whether any undue intimidation or other forms of pressure caused him to confess involuntarily. The district court identified only one such factor, the duration of the interrogation. Hardaway was initially brought to the police station at 8:30 a.m. and briefly interviewed. By 10:30 a.m. he was considered a suspect, had received his *Miranda* warnings, and had been questioned again for another 15 minutes, at which time he changed his story slightly. At that point he was left more or less alone for over five hours. At 4:30 p.m., Hardaway was notified that Griffin was telling police a different story, and he then confessed. That interrogation took about one hour. Another delay ensued while Harney was contacted, and she then joined the police in interrogating Hardaway from 7:00 to 8:00 p.m. Hardaway was detained again while a court reporter was located to take a transcribed statement from 10:45 p.m. until midnight. The statements made by Hardaway at 4:30, 7:00, and 10:45 p.m. were in all material respects identical.

It is thus somewhat misleading for Hardaway to contend that he was interrogated for 16 straight hours by "relays" of officers and deprived of sleep. We fail to understand why Hardaway should have been provided a place to sleep between the hours of 8:30 a.m. and 4:30 p.m. when most eighth graders would not be sleeping anyway. The mere fact that two officers questioned Hardaway twice in the morning and two different officers spoke to him at 4:30 p.m., with a total interrogation time prior to the initial confession of less than 90 minutes, presents a markedly different scenario from the five grueling hours of interrogation experienced in *Haley*. 322 U.S. at 598. The police used no particularly coercive or heavy-handed interview techniques, such as making Hardaway strip and wear jail clothes or handcuffs, questioning him for lengthy periods without a break, misrepresenting evidence, or showing graphic pictures of the murder scene. See *Woods v. Clusen*, 794 F.2d 293, 296 (7th Cir. 1986) (granting writ on the basis of evidence of such mistreatment); *Riley*, 653 F.2d at 1162-63 (denying writ where defendant was handcuffed and given jail clothes but there was no evidence of mistreatment and interview only lasted four hours). Instead, the officers merely asked Hardaway a few questions about his whereabouts and truthfully confronted him with the statements of two witnesses whose versions of events contradicted his own. We cannot find that the state court's determination that this was not unduly coercive behavior on the part of the police was unreasonable, even when dealing with a 14-year-old.

One could still argue that leaving a juvenile alone in an interrogation room for eight hours creates enough psychological pressure to render the confession involuntary. Obviously, adolescents are less mature than adults and perhaps such a time lapse, which we would expect an adult to weather, would instead render involuntary the confession of a child, especially one deprived of any adult assistance.

If we were a state appellate court, we might well find that on balance the psychological tension caused by leaving a boy of 14 alone in an interview room, hungry, scared, and tired, was enough to exclude the confession. But we may set aside the contrary findings of the Illinois trial and appellate courts only if their determination was unreasonable. *Williams*, 529 U.S. at 411. As the state courts pointed out, there are arguments that pass the lenient test of "reasonableness" in favor of finding the confession voluntary.

First, Hardaway was not intimidated, abused, or physically coerced in any way. A photograph taken at the time of the confession substantiates this fact. Hardaway was not psychologically tricked into confessing by officers but only confronted with truthful contradictory evidence.

Second, Hardaway had extensive prior history with parts of the criminal justice system. Prior to the Sandifer murder Hardaway had been arrested 19 times between 1992 and 1994 and charged with four counts of battery, three counts of criminal trespass to vehicle, two counts of aggravated battery, two counts of robbery, criminal damage to property, attempted criminal sexual assault, disorderly conduct, assault, possession of a controlled substance, unauthorized use of a weapon, possession of marijuana, and delivery of a controlled substance. Three of the complaints were adjusted in complaint screening, and seven were station adjustments. Hardaway had been placed on juvenile supervision, but had violated that supervision. Seven times Hardaway had appeared in juvenile court with appointed counsel. As the state courts recognized, past brushes with the law weigh against the normal presumption that youths are specially sensitive to coercion. *Wilderness*, 160 F.3d at 1175; *Johnson*, 28 F.3d at 645.

It is true that there is no evidence that Hardaway had ever received *Miranda* warnings at any of these 19 ar-

rests. However, based on the seriousness of the charges in many of those counts, we cannot conclude that the circuit court was unreasonable in weighing Hardaway's frequent police encounters and general familiarity with the criminal justice system in favor of the confession's voluntary nature.

Finally, Hardaway appeared to law enforcement officials to understand his rights when they were read to him. At the beginning of his court-reported statement he claimed to understand those rights and waived them. He also explained his rights back to Harney in his own words. To Hardaway, the right to silence meant "he didn't have to talk if he didn't want to." Hardaway also stated that anything he told assistant state's attorney Harney she could tell a judge in a case against him. As for the right to an attorney, he said that this meant that he could have a lawyer there when Harney questioned him about the case, and he could have one even if he and his family could not pay for one. This recitation indicates that there was adequate support for the state court finding that Hardaway did have at least a basic comprehension of his rights. As the trial judge noted, there is no indication that Hardaway, whose test scores showed an IQ of 95 and the educational performance of an average sixth-grader, had mental incapacities or other infirmities that would make him incapable of understanding his rights. See *Rice v. Cooper*, 148 F.3d 747 (7th Cir. 1998) (upholding waiver of rights by mentally retarded, illiterate 16-year-old).

There is no doubt that Hardaway's youth, the lack of a friendly adult, and the duration of his interrogation are strong factors militating against the voluntariness of his confession; indeed, it seems to us that on balance the confession of a 14-year-old obtained in those circumstances may be inherently involuntary. Nevertheless, the weighing of factors under the totality of circumstances

test is a subject on which reasonable minds could differ. Here the trial court stated that it weighed all relevant factors, and after doing so it concluded that the lack of any apparent coercion by the police, Hardaway's recitation of his rights, his mental capacity, and his past experience with the criminal justice system on balance rendered his confession voluntary and admissible. Even assuming that the weighing of factors by the Illinois state courts in this case was incorrect, the balance is close enough that, in the final analysis, it is not unreasonable. *Williams*, 529 U.S. at 411. Keeping in mind our deferential standards of review under AEDPA, we are compelled to defer to the findings and the conclusion of the state courts.

### III

Because the determination of the Illinois courts that Hardaway's confession was voluntary under the totality of the circumstances was not an unreasonable application of clearly established federal law, the district court should not have granted the writ of habeas corpus. For the foregoing reasons, the judgment of the district court is REVERSED.

A true Copy:

      Teste:

              _____
*Clerk of the United States Court of Appeals for the Seventh Circuit*