In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-3571

ALEX GILBERT,

*Petitioner-Appellant,*

*v.*

JAY M. MERCHANT, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 2388—**David H. Coar**, *Judge.*

ARGUED NOVEMBER 29, 2006—DECIDED JUNE 8, 2007

Before BAUER, CUDAHY, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* At the age of fifteen, Alex Gilbert pleaded guilty to first degree murder in the Circuit Court of Cook County, Illinois, and was ordered to serve a prison term of thirty years. After exhausting his state-court remedies, Gilbert filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, contending that his trial counsel was ineffective in failing to seek the suppression of his post-arrest statement, which acknowledged his involvement in the crime. Gilbert was fourteen years old at the time of his arrest, and both his confession and the interrogation that preceded it took place in the absence of an attorney, parent, or other friendly adult.

On that basis, Gilbert contends that his statement was involuntary and would have been suppressed; had his attorney moved for and obtained the suppression, Gilbert alleges, he would have gone to trial rather than pleading guilty. The district court denied Gilbert's habeas petition. We affirm.

## I.

Gilbert's murder conviction arose from the killing of college student Kevin Heard in 1992. Heard was shot because he was mistakenly believed by gang members to be affiliated with a rival gang. Gilbert did not fire the shot that killed Heard, but he was the individual who identified Heard as a rival gang member and, if the State's evidence is credited, urged his fellow gang members to shoot Heard.

Heard was shot in Chicago late in the evening of July 4, 1992. He was on his way to a barbeque along with two friends, Andrea Lanier and Calvin Stringer. Lanier and Stringer were driving to the barbeque together in one car, while Heard was following them in his mother's car. The barbeque was taking place in the 8400 block of South Throop Street in Chicago.

When the cars arrived in the 8400 block of Throop Street just after midnight, Lanier and Stringer stopped their car in the middle of the street to locate the address of the barbeque and look for a parking space, and Heard stopped behind them. Gilbert, a member of the Blackstone street gang, was standing on a sidewalk nearby with other gang members. When Heard's car stopped, Gilbert walked up to the car and noticed that Heard was wearing a baseball-style cap with the bill of the cap tilted toward his right ear. Gilbert knew that members of the Disciples, a rival street gang, wore their hats in this fashion. When someone

on the sidewalk asked Gilbert whether the driver of the car was a Disciple, Gilbert responded in the affirmative, saying "that's folks." ("Folks" is a slang term often used to describe Disciple members.) Blackstone gang member Joseph Owens then emerged from a nearby gangway and fired twice at Heard's car with a .45-caliber weapon.

Monica Collier was visiting relatives in the 8400 block of South Throop and moments before the shooting had returned to her parked car to retrieve a radio and cassette tapes. While walking to her car, she had observed several individuals she knew to be Blackstone gang members milling about on the sidewalk. As she was retrieving the tapes and radio from the car, two cars drove up and stopped next to her car. Collier saw Gilbert, who was carrying a crutch in his hand, walk up to the second of the two cars, point the crutch at the car, and call out "that's folks" to the other gang members standing on the sidewalk. Gilbert also yelled out "pop him" or "cap him" or words to that effect. Collier then witnessed Owens, who was standing near a gangway at the side of 8437 South Throop, fire a handgun at the second car. Collier ducked down and saw the two cars next to hers speed off.

Lanier and Stringer had noticed someone approach their cars from the vicinity of 8437 South Throop and had heard someone call out "Cap his ass!" When they heard the two gunshots, they quickly drove off with Heard close behind them.

Moments later Lanier and Stringer noticed that Heard was flashing his headlights at them. They pulled over, walked back to Heard's car, and found him slumped over. Heard had been shot in the back. They took Heard to a hospital, where he died later that morning.

Investigation over the ensuing twenty-four hours led the police to Gilbert and Owens. The rear window of Heard's car had been shattered, and crime scene technicians

found broken glass in the street in front of 8443 South Throop. They also recovered a .45-caliber bullet casing from the gangway next to 8437 South Throop. Police detectives questioned Collier, who identified the shooter as a man she knew as "Joe" and gave them a description of the individual with the crutch who had called out "that's folks." Police also spoke with Abdula Tate, who told them that a male youth by the name of "Alex" had been using her crutches at the time of the shooting. Tate's general description of Alex as an African-American male of medium height and aged fourteen to fifteen corresponded with the description Collier had given of the individual who had pointed a crutch at Heard's car. A records check subsequently revealed that both Owens and Gilbert previously had been arrested in a joint raid on 8501 South Throop Street conducted by Chicago police and the federal Bureau of Alcohol, Tobacco, and Firearms. The information that police had in their records concerning Gilbert's appearance was consistent with the descriptions that Collier and Tate had provided.

At 9:30 on the morning of July 6, police arrived at Gilbert's home (one block east of the shooting) and arrested him. Gilbert was alone in the house at that time. Police officers read Gilbert his *Miranda* rights in the presence of a youth officer before transporting him to Area 2 headquarters for questioning.

Over the next nine hours, police interrogated Gilbert and ultimately secured his confession. A youth officer was present during the questioning, but so far as the record reveals the officer did not consult with Gilbert or take any affirmative steps to protect his interests. Gilbert at first denied any involvement in the shooting, claiming that he had been in Dalton, Illinois at the time. However, at approximately 12:30 p.m., Gilbert was placed in a lineup along with three other African-American male teens (all of whom were seventeen years old). On viewing the

lineup, Collier identified Gilbert as the individual who had walked up to Heard's car, pointed a crutch at the car, and called out both "that's folks" and words to the effect of "shoot him." Police subsequently advised Gilbert that a witness could place him at the scene of the shooting.

At approximately 6:30 p.m., after he was again advised of his *Miranda* rights, Gilbert gave a statement to an Assistant Cook County State's Attorney ("ASA"). A police detective and a youth officer were among those present. Gilbert indicated that he was fourteen years old and that he had been a member of the Blackstone gang for about two years. Gilbert acknowledged that at or around midnight on July 4, 1992, he and other gang members were hanging out in front of the residence located at 8437 South Throop Street, where one of the gang members lived. Gilbert was playing with crutches that belonged to a friend. Two cars pulled up and stopped in the street. Gilbert walked up behind the second car and noticed that the driver was wearing a baseball cap in the manner of a Disciples gang member. Someone called out to ask whether the driver was a Disciple, and Gilbert responded that he was. "Joe," a higher-ranking member of the Blackstone gang, then ran out from the gangway along side of the residence at 8437 South Throop holding a .45-caliber handgun. Gilbert had seen that gun two days earlier when the gang member who lived at that address had been asked to hide it. "Joe" fired a shot at the car, and Gilbert saw the driver duck down and then sit back up. "Joe" then fired a second shot, and again Gilbert saw the driver duck down; this time, however, he did not see the driver sit up straight. The two cars then drove off.

In his statement, Gilbert acknowledged each of his *Miranda* rights and indicated that he understood them. He denied the use of alcohol or drugs at the time of his

statement. He indicated that he had been treated well by both the police and the ASA who took his statement. He acknowledged that he had been given food and drink and that he had been able to use the bathroom. He reported that he had not been threatened, nor had he been promised anything in exchange for his statement. He acknowledged his understanding that the ASA was not his attorney and that he could be charged as an adult. Gilbert signed each page of his transcribed statement, as did the ASA, police detective, and youth officer who were present when he gave the statement.

Meanwhile, Gilbert's mother, Theresa Jackson, had learned of her son's arrest that afternoon and had arrived at police headquarters at approximately 2:30 p.m. (Jackson had learned of the arrest from a neighbor; the police themselves evidently had not attempted to notify her.) She would later submit an affidavit indicating that she repeatedly asked to see her son, but was told she could not do so because he was being questioned. At approximately 7:00 p.m., she saw officers escort her son from the interview room to the jail. She averred that Gilbert told her that the police had made him "sign something" and urged her to call a lawyer.

A medical examiner later determined that Heard had died from a gunshot to his back. The examiner recovered a .45-caliber slug from Heard's body.

Gilbert was charged as an adult with first degree murder based on an accountability theory. *See McFowler v. Jaimet*, 349 F.3d 436, 438-39, 447-48 (7th Cir. 2003). On November 10, 1993, Gilbert, who by then had turned fifteen years old, pleaded guilty to this charge. He was admonished of his trial rights, signed a written waiver of his right to a jury trial, and informed the court that he was "[p]leading guilty of [his] own free will." R. 28 at C38. The prosecutor summarized the evidence against Gilbert,

to which he had stipulated. That evidence included Gilbert's confession, the eyewitness testimony and identification of Gilbert by Collier, and forensic evidence from the medical examiner and a weapons expert. *Id.* at C38-C52. After this evidence was summarized, the trial judge and prosecutor both asked Gilbert whether these were the facts to which he was pleading guilty, and Gilbert twice answered in the affirmative (the second time under oath). *Id.* at C52. After Gilbert indicated that he understood his rights, the consequences of changing his plea, and the possible penalties he faced and that he still wished to plead guilty, the trial court found that his plea was both knowing and voluntary and supported by the evidence and accepted the plea. *Id.* at C53. After hearing from the victim Heard's mother, the court sentenced Gilbert to an agreed-upon term of thirty years. *Id.* at C60. Gilbert did not seek to withdraw his plea nor did he appeal his conviction or sentence.

Three years later, however, Gilbert filed a pro se petition for post-conviction relief in the state trial court. Among other points, Gilbert asserted that the police had questioned him without a parent present, that he was denied consultation with an attorney although his mother repeatedly had asked for one, and that his confession was inadmissible. R. 14 Ex. A. The court appointed an attorney to represent Gilbert in the post-conviction proceeding, and Gilbert's counsel then filed a supplemental petition on his behalf. The supplemental petition asserted that Gilbert's confession was involuntary given that Gilbert was questioned in the absence of (and without notice to) his mother, that Gilbert's trial counsel was ineffective in failing to seek the suppression of his confession, and that Gilbert's guilty plea was itself involuntary to the extent that the factual basis for his plea included his allegedly involuntary confession. R. 14 Ex. B. Gilbert's mother submitted an affidavit in support of the

supplemental petition in which she averred that she went to the police station at 2:30 p.m. on the date of Gilbert's arrest and interrogation, that she asked to see her son and was told she could not see him while he was being questioned, that she saw her son as he was being escorted from the interview room to jail, that Gilbert told her that he had not done anything and that he had been made to sign something, and that she should call a lawyer. *See id.* at C20-C21.

On the State's motion, the post-conviction court dismissed Gilbert's petition (as supplemented by his appointed counsel) without conducting an evidentiary hearing. The court held in the first instance that because Gilbert had not sought to withdraw his guilty plea on a timely basis, it lacked authority to review anything but jurisdictional issues, and Gilbert had raised no such issues. *See* R. 14 Ex. D. at 5-6. Alternatively, assuming that it was empowered to reach the merits of Gilbert's petition, the court found no basis on which to disturb his conviction. On review of the plea transcript, the court found no indication that his plea was "anything other than voluntary." *See id.* at 6. Gilbert's contention that his confession was involuntary was not sufficient to demand further inquiry, including an evidentiary hearing. *Id.* Even assuming that the authorities had deliberately and improperly denied Gilbert access to his mother during questioning as he alleged, interrogation in the absence of a parent was not alone enough to show that his confession was illegally obtained, "and that is from my reading of all these documents essentially all that he is claiming." *Id.* Finally, even if Gilbert's trial counsel deprived him of effective assistance in failing to move for the suppression of his confession, Gilbert had not established prejudice, because his guilty plea was based not only on his confession, but also on independent evidence that included eyewitness testimony. *Id.* Gilbert appealed.

The Illinois Appellate Court affirmed. *People v. Gilbert*, No. 1-99-3363 (Ill. App. Ct. Oct. 30, 2001) (unpublished order) (R. 14 Ex. F) (hereinafter cited as "App. Ct. Order"). The appellate court agreed with Gilbert that the lower court had erred in believing that it lacked jurisdiction to entertain Gilbert's claims on their merits in the absence of a motion to withdraw his guilty plea. *Id.* at 8. However, it rejected Gilbert's contention that the court was obliged to conduct an evidentiary hearing before disposing of his post-conviction petition. Only a substantial showing based on the original record and any affidavits filed in support of the petition that the petitioner's constitutional rights had been violated would necessitate an evidentiary hearing, the appellate court reasoned. *Id.* at 9. The record in this case lent no support to the notion that Gilbert's guilty plea was not voluntary and knowing. *Id.* at 10.

As for Gilbert's contention that his attorney was ineffective in failing to seek suppression of his confession, Gilbert would have to show both that a motion to suppress would have been granted on the ground that his statement was involuntary and that the outcome of the trial proceeding would have been different. *Id.* at 10-11. In the court's view, Gilbert's limited challenge to his confession did not call its voluntariness into question. *Id.* at 12. The court noted that the voluntariness of a defendant's statement turns on the totality of circumstances, with the relevant factors including the defendant's age, education, intelligence, experience and physical condition; the duration of the questioning; whether the defendant was advised of his constitutional rights; whether the defendant was threatened, enticed with promises, or coerced; and whether the defendant was induced to speak by police deception. *Id.* at 11. For juveniles, additional considerations include the time of day during which the youth was questioned and the presence or absence of a parent or other friendly adult. *Id.* at 11-12. Gilbert had made no argument

as to any of these factors on appeal or in the lower court except as to the absence of his mother (and his inability to speak with her) during questioning, which he maintained was sufficient in and of itself to render his statement involuntary. *Id.* at 12. In that regard, the appellate court observed, Gilbert was wrong on the law: the absence of a parent during the questioning of a juvenile does not automatically render the juvenile's statement invalid, but rather is one factor that bears on the voluntariness of the statement. *Id.* at 12. Gilbert had not identified any other factor calling into question the voluntary nature of his statement. *Id.* at 13. Thus, Gilbert had not demonstrated that a challenge to the voluntariness of his statement would have been successful. *Id.* at 13. The court consequently had no reason to question the efficacy of Gilbert's trial counsel.

The court also found that Gilbert had not shown that he was prejudiced by his attorney's omission to seek suppression of his statement. Apart from Gilbert's confession, the stipulated evidence showing Gilbert's complicity in Heard's murder was sufficient to supply a factual basis for the plea. *Id.* Gilbert's post-conviction petition was therefore properly dismissed. *Id.*

Gilbert filed a petition for leave to appeal to the Illinois Supreme Court, which that court denied. R. 14 Ex. H. It likewise denied his request for reconsideration. R. 14 Ex. J.

Gilbert then sought a writ of habeas corpus from the district court, renewing his argument that his trial counsel was deficient in failing to seek suppression of his confession; but the district court denied his request. Assessing the voluntariness of Gilbert's confession, the district court noted the need for "'special caution'" where juvenile confessions are concerned. R. 30; *Gilbert v. Welborn*, 2005 WL 1458063, at *5 (N.D. Ill. June 16, 2005) (quoting *In re*

*Gault*, 387 U.S. 1, 45, 87 S. Ct. 1428, 1453 (1967)). The court found it "deeply troubling, even alarming" that Gilbert's mother sat at the police station for hours, unable to see her son, until the authorities had finished questioning him and his confession had been secured. *Id.* Nonetheless, the court was not persuaded that the Illinois Appellate Court's determination that Gilbert's confession was voluntary (and thus would not have been suppressed had his counsel pursued that relief) was either contrary to Supreme Court precedent or involved an unreasonable application of that precedent, as the Antiterrorism and Effective Death Penalty Act ("AEDPA") requires before habeas relief may be granted. *See* 28 U.S.C. § 2254(d)(1).

> The Seventh Circuit has stated that the absence of an interested adult when a juvenile confesses "cannot be deemed dispositive." *Hardaway* [*v. Young*], 302 F.3d [757,] at 765 [(7th Cir. 2002)]. As in the *Hardaway* case, Petitioner was only fourteen years old when he was arrested and brought to the police station for interrogation. He was questioned without a parent present over a period of almost ten hours between 9:30 a.m. and 7:00 p.m. He stated in his confession that he was given food and drink and was not mistreated or coerced. The state appellate court examined all of these factors and noted that Petitioner "made no argument in the trial court nor on appeal with respect to any of the factors listed above except that he was not allowed to speak with his mother before or during questioning." *Gilbert*, No. 99-3393, slip op. at 12. Petitioner does not allege that he was not given his *Miranda* warnings or that he did not understand them. He does not allege that he was physically threatened or mistreated. It is true that a fourteen year old, alone in an interrogation room without a parent present, may experience psychological and

emotional pressure that an older, more mature adult would not. But the AEDPA does not permit a federal court to conduct such a searching review of the state court decisions. The state court applied the correct legal standard and weighed the Petitioner's arguments. There is insufficient evidence in the record before us to find that the state court was unreasonable when it determined that the Petitioner's confession was not involuntary.

2005 WL 1458063, at *5. The district court likewise sustained as reasonable the appellate court's further determination that Gilbert was not prejudiced by his attorney's alleged ineffectiveness in not moving to suppress his confession. Although the district court noted that the appellate court had applied a possibly incorrect standard—asking whether there was an adequate factual basis for Gilbert's guilty plea apart from his confession, rather than whether there was a reasonable probability that Gilbert would have gone to trial in lieu of pleading guilty had his confession been suppressed—the error was of no moment. *Id.* at *6. The court found that Gilbert had alleged no facts which gave rise to a reasonably probability that he would have opted for trial over a guilty plea had his attorney successfully pursued a motion to suppress his confession. *Id.* Although Gilbert asserted that he would have gone to trial, that allegation was unsupported by an affidavit from his trial counsel or any other comparable evidence, and the record did not suggest that the other evidence of Gilbert's guilt was so weak that a reasonable defendant in Gilbert's position would have elected trial over a plea. *Id.*

For these reasons, the district court denied Gilbert's petition for a writ of habeas corpus. Gilbert appealed, and a member of this court granted him a certificate of appealability and appointed counsel to represent him in this appeal.

**II.**

Gilbert's appeal challenges the state appellate court's findings as to both prongs of his attorney ineffectiveness claim. He contends that the appellate court acted unreasonably in finding his confession to have been voluntary, such that his trial counsel was not obliged to seek its suppression, based on a sparse evidentiary record. Gilbert emphasizes that his post-conviction petition, as supplemented by his counsel, mounted a broad challenge to the voluntariness of his confession. Yet, the post-conviction court dismissed his petition without conducting an evidentiary hearing in order to flesh out the circumstances surrounding his confession and without rendering findings as to all of the various factors that bear on the voluntariness of a confession. Gilbert maintains that without a developed record that casts light on such factors as his education, background, intelligence, and ability to comprehend his legal rights and provides more detail as to what occurred during his interrogation, the state appellate court could not fully evaluate the voluntariness of his confession and certainly was in no position to reject his contention that the confession was involuntary. On the contrary, in his view, what little relevant evidence there is in the record suggests that his confession was not voluntary. At a minimum, he believes he is entitled to an evidentiary hearing in the district court, if not an outright determination by this court that his confession was involuntary. With respect to the prejudice prong of his ineffectiveness claim, Gilbert contends that had his trial counsel recognized the involuntary nature of his confession and sought its suppression, the motion would have been granted and it is reasonably likely in that event that he would have opted for trial in lieu of pleading guilty. Apart from his confession, the evidence that he was complicit in Heard's murder consisted largely of the (prospective) testimony of a single eyewitness (Collier) who had identi-

fied him based on what he asserts was a suggestive line-up and whose credibility as a witness had not been tested. Suppression of the confession thus would have limited the force of the State's case considerably, and in Gilbert's view, that supplies adequate objective support for the notion that he likely would have gone to trial.

The AEDPA sets the parameters for our review. We may grant habeas relief only if the state courts' adjudication of Gilbert's ineffectiveness claim resulted in a decision that either was contrary to, or involved an unreasonable application of, federal law as determined by the United States Supreme Court, § 2254(d)(1), or if it produced a decision that was based on an unreasonable determination of the facts given the evidence before the state courts, § 2254(d)(2). A state-court decision is contrary to Supreme Court precedent if it is inconsistent with the Supreme Court's treatment of a materially identical set of facts, or if the state court applied a legal standard that is inconsistent with the rule set forth in the relevant Supreme Court precedent. *Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 1850 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06, 412-13, 120 S. Ct. 1495, 1519-20, 1523 (2000)). A state-court decision constitutes an unreasonable application of Supreme Court precedent within the meaning of section 2254(d)(1) when, although it identifies the correct legal rule, it applies that rule in a way that is objectively unreasonable. *Yarborough v. Gentry*, 540 U.S. 1, 5, 124 S. Ct. 1, 4 (2003); *Bell*, 535 U.S. at 694, 122 S. Ct. at 1850; *Williams*, 529 U.S. at 409-10, 120 S. Ct. at 1521-22. Our own disagreement with a state court's analysis is not sufficient to meet this standard; rather, the state court's analysis must lie "'well outside the boundaries of permissible differences of opinion'" in order for us to characterize it as an unreasonable application of Supreme Court precedent. *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003) (quoting *Hardaway v. Young*, 302 F.3d

757, 762 (7th Cir. 2002)). As we have discussed, the district court concluded that the Illinois Appellate Court's handling of Gilbert's ineffectiveness claim was neither contrary to Supreme Court precedent nor involved an unreasonable application of that precedent, and our review of the district court's decision is de novo. *E.g.*, *Williams v. Bartow*, 481 F.3d 492, 497 (7th Cir. 2007).

Gilbert's request for a writ of habeas corpus is premised on the claim that his trial counsel did not competently represent him, thereby depriving him of the effective assistance of counsel guaranteed him by the Sixth and Fourteenth Amendments. *See Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792 (1963). As the Illinois Appellate Court recognized, a convicted defendant challenging the effectiveness of the legal counsel he received must show both that his attorney's performance was objectively deficient—that is, outside the range of competent legal representation—and that he was prejudiced by the substandard performance. *Strickland v. Washington*, 466 U.S. 668, 687-696, 104 S. Ct. 2052, 2064-69 (1984); *see also Lockhart v. Fretwell*, 506 U.S. 364, 369-70, 113 S. Ct. 838, 842-43 (1993). Gilbert faulted his trial counsel for failing to recognize that his confession was involuntary and for not filing a motion to suppress his confession, which he believes was central to the State's case against him and in turn to his decision to plead guilty. In order to prevail on this claim, then, Gilbert was obliged to show two things. First, he had to demonstrate that his confession was involuntary, such that his attorney would have been successful had he sought suppression of the confession. *See United States v. Cieslowski*, 410 F.3d 353, 360 (7th Cir. 2005) ("When the claim of ineffective assistance is based on counsel's failure to present a motion to suppress, we have required that a defendant prove the motion was meritorious.") (coll. cases), *cert. denied*, 126 S. Ct. 1021 (2006). Such a showing would speak to both

prongs of the ineffectiveness claim: it would demonstrate that the failure to file a motion to suppress was objectively unreasonable; and it would supply partial proof of prejudice, by establishing that the a suppression motion would have removed Gilbert's confession from the State's case. Second, given that he was convicted based on his own plea, Gilbert was obliged to complete the demonstration of prejudice by showing that had his confession been suppressed, it is reasonably likely that he would have gone to trial rather than plead guilty. *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985); *see also*, *e.g.*, *Bethel v. United States*, 458 F.3d 711, 716-17 (7th Cir. 2006), *cert. denied*, 127 S. Ct. 1027 (2007). The Illinois Appellate Court, of course, concluded that Gilbert had made neither showing. The question for us (as it was for the district court) is whether its decision either was contrary to Supreme Court precedent or reflected an unreasonable application of that precedent.

We turn first to the voluntariness of Gilbert's confession. Whether a confession was voluntary depends on the totality of the circumstances surrounding that confession, including "both the characteristics of the accused and the details of the interrogation" that resulted in the confession. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S. Ct. 2041, 2047 (1973). As the district court recognized, the voluntariness of juvenile confessions must be evaluated with "special care." *Haley v. Ohio*, 332 U.S. 596, 599, 68 S. Ct. 302, 304 (1948); *see In re Gault*, 387 U.S. 1, 45, 87 S. Ct. 1428, 1453 (1967). Relevant considerations include "the juvenile's age, experience, education, background and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S. Ct. 2560, 2572 (1979). The length of time that the juvenile was questioned by the authorities

and the absence or presence of a parent or other friendly adult are additional factors that bear on the voluntariness of the juvenile's confession. *Hardaway*, 302 F.3d at 762. A juvenile's ability to consult with a friendly adult is relevant because, as the Supreme Court explained in *Gallegos v. Colorado*, a teenager may not on his own be able to fully appreciate what is at stake when the police seek to question him:

> [A] fourteen-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police.
>
>                             . . .
>
> He cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions. He would have no way of knowing what the consequences of his confession were without advice as to his right—from someone concerned with securing him those rights—and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself. A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not. Adult advice would have put him on a less unequal footing with his interrogators. Without some adult protection against this inequality, a fourteen-year-old boy would not be able to know, let alone assert, such constitutional rights as he had. . . .

370 U.S. 49, 54, 82 S. Ct. 1209, 1212-13 (1962); *see also A.M. v. Butler*, 360 F.3d 787, 800-01 & nn. 10-11 (7th Cir. 2004); Kenneth J. King, *Waiving Childhood Goodbye: How Juvenile Courts Fail to Protect Children from Unknowing, Unintelligent, and Involuntary Waivers of Miranda Rights*, 2006 Wis. L. Rev. 431, 432-33, 434-44 (noting the complexity of a decision to waive one's rights

and explaining why, given the way in which an adolescent develops psycho-socially and his brain matures, a juvenile is ill-equipped to make a knowing and intelligent waiver without adult assistance). Yet, as we have also acknowledged, despite *Gallegos*' forceful language as to the importance of a friendly adult, subsequent decisions have revealed that the absence of a parent or other friendly presence during interrogation, although it remains an important consideration, is not dispositive vis-à-vis the voluntariness of a juvenile's confession. *Hardaway*, 302 F.3d at 763-65; *see Michael C.*, 442 U.S. at 724-27, 99 S. Ct. at 2571-73 (adopting totality approach to review of juvenile confessions); *see also Bridges v. Chambers*, 447 F.3d 994, 998-99 (7th Cir.), *cert. denied*, 127 S. Ct. 408 (2006); *Ruvalcaba v. Chandler*, 416 F.3d 555, 561 (7th Cir. 2005), *cert. denied*, 126 S. Ct. 1039 (2006); King, *Waiving Childhood Goodbye*, 2006 Wis. L. Rev. at 448 (noting that in *Michael C.*, "the Court abandoned reliance on adult guidance as the measure of the admissibility of a juvenile's statement in favor of the 'totality of the circumstances'").[1]

Gilbert maintains that the Illinois Appellate Court's determination that his confession was voluntary cannot be deemed reasonable, given that a court must consider the totality of relevant factors and yet the record in this case was (and is) silent as to many of those factors owing to the post-conviction court's decision not to conduct an evidentiary hearing. Evaluating the voluntariness of a

---

[1] As we noted earlier, a youth officer was present while Gilbert was questioned and when he gave his statement. However, such an officer is no substitute for a parent, attorney, or other friendly adult, and where, as here, the record does not indicate that the officer took any steps on the juvenile's behalf, the officer's presence is not a factor that weighs in favor of the juvenile's statement being deemed voluntary. *See*, *e.g.*, *Ruvalcaba*, 416 F.3d at 561 n.1; *A.M.*, 360 F.3d at 801.

confession indeed is an "exceedingly sensitive task," *Jackson v. Denno*, 378 U.S. 368, 390, 84 S. Ct. 1774, 1788 (1964), one that requires the trial court to initiate procedures that are "fully adequate to insure a reliable and clear-cut determination of the voluntariness of the confession, including the resolution of disputed facts upon which the voluntariness issue may depend," *id.* at 391, 84 S. Ct. at 1788. In many cases, an evidentiary hearing will be necessary for the court to reliably determine whether or not the confession was voluntary in view of the court's obligation to consider the totality of the circumstances surrounding the interrogation. *See Michael C.*, 442 U.S. at 725, 99 S. Ct. at 2572 ("The totality approach permits—indeed it mandates—inquiry into all the circumstances surrounding the interrogation."); King, *Waiving Childhood Goodbye*, 2006 Wis. L. Rev. at 450 ("[*Michael C.*'s] undeniably broad language and its direction to inquire into the juvenile's capacity to understand the warnings, Fifth Amendment rights generally, and the consequences of a waiver of those rights more specifically, suggests that the determination of whether a juvenile has knowingly, intelligently, and voluntarily waived [his] rights will be a broad, probing inquiry."). Obviously a hearing will be compulsory when the relevant facts are disputed. *Jackson*, 378 U.S. at 391-92, 84 S. Ct. at 1789.

However, we cannot say that the Illinois Appellate Court acted unreasonably in proceeding to assess the voluntariness of Gilbert's confession notwithstanding the limited state of the evidentiary record. The court recognized that the voluntariness of the confession must be evaluated on the totality of the circumstances, and it identified the range of circumstances that are relevant. App. Ct. Order

at 11.[2] However, the court observed that the exclusive focus of Gilbert's arguments in the post-conviction court and on appeal was on his inability to speak with his mother before or during his interrogation. App. Ct. Order at 12. It was undisputed that Gilbert's mother had not been permitted to see him at any time prior to his confession; the only question was the import of his sequestration from her. Gilbert's assertion, as the appellate court understood it, was that (in view of his age) the absence of his mother during questioning in and of itself compelled the conclusion that his confession was involuntary. App. Ct. Order at 12. But as the appellate court correctly recognized, the absence of a parent is not dispositive: it is the totality of the circumstances underlying a juvenile confession, rather than the presence or absence of a single circumstance, that determines whether or not the confession should be deemed voluntary. *Michael C.*, 442 U.S. at 724-27, 99 S. Ct. at 2571-73; *Bridges*, 447 F.3d at 997, 998-99; *Ruvalcaba*, 416 F.3d at 560-61; *Hardaway*, 302 F.3d at 763-65; *Stone v. Farley*, 86 F.3d 712, 717-18 (7th Cir. 1996). Indeed, we ourselves have sustained as reasonable a state court's holding that a fourteen year-old's confession was voluntary notwithstanding the absence of a friendly adult. *Hardaway*, 302 F.3d at 766-68. Given the all-or-nothing nature of Gilbert's argument, we cannot say that the Illinois Appellate Court was foreclosed from ruling on the voluntariness of Gilbert's confession not-

---

[2] Although the court cited state rather than federal cases, these cases and the factors they identify as relevant are consistent with Supreme Court precedent. *See Mitchell v. Esparza*, 540 U.S. 12, 16, 124 S. Ct. 7, 10 (2003) (per curiam) ("a state court need not even be aware of [United States Supreme Court] precedents 'so long as neither the reasoning nor the result of the state-court decision contradicts them'") (quoting *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002)).

withstanding the fact that an evidentiary hearing had not been conducted.

Had Gilbert argued that the absence of his mother was one of multiple factors that called the voluntariness of his confession into question (or that his mother's absence rendered other factors more important), then it might not have been possible for the state courts to dispose of his challenge without the benefit of an evidentiary hearing to the extent those factors were disputed or the record shed no light upon them. *See Jackson*, 378 U.S. at 391-92, 84 S. Ct. at 1789. But the appellate court did not understand Gilbert to be making a more broad-based challenge to the voluntariness of his confession, and having reviewed his pleadings in the post-conviction proceedings, we cannot say that the appellate court erred in its understanding. Although Gilbert's supplemental petition could have been construed as making a more broad-based challenge to the voluntariness of his confession, *see* R. 14 Ex. B. at C16 (identifying multiple factors for court "to consider" in evaluating the voluntariness of Gilbert's confession, including his lack of experience dealing with the police), the post-conviction court did not understand him to be relying on factors other than his isolation from his mother, *see id.* Ex. D at 6, and Gilbert did not contend on appeal that the lower court had construed his claim too narrowly. Beyond his age, Gilbert did not cite to the appellate court additional circumstances that, alone or in combination with the absence of his mother, suggested that his conviction was involuntary. On the contrary, it was his inability as a youth to be able to consult with his mother on which Gilbert rested his argument: "Although the totality of the circumstances is the relevant inquiry," Gilbert argued, "the absence of a parent when the suspect is a juvenile is the principal component of voluntariness." *Id.* at 12. Furthermore, Gilbert made no proffer to either the post-conviction court

or the appellate court as to what additional light he expected an evidentiary hearing to cast on the voluntariness of his confession. Under those circumstances, it was not unreasonable for the appellate court to resolve his claim of involuntariness on the record as it stood rather than remanding for an evidentiary hearing. *See Procunier v. Atchley*, 400 U.S. 446, 451, 91 S. Ct. 485, 488 (1971) (in order to compel a hearing on the voluntariness of his confession, a petitioner must show that his version of events, if true, would compel the conclusion that his confession was involuntary); *see also Humphreys v. Gibson*, 261 F.3d 1016, 1024-25 (10th Cir. 2001) (habeas petitioner's assertion that existing record was insufficient to establish voluntariness of his confession was not enough to compel an evidentiary hearing); *Lucero v. Kerby*, 133 F.3d 1299, 1311-12 (10th Cir. 1998) (petitioner's suggestion that, in light of "unanswered" questions concerning circumstances under which his statements to police were made, there might be additional facts sufficient to support his claim of involuntariness that would emerge at a new hearing, was insufficient to establish his right to such a hearing); *Townsend v. Twomey*, 452 F.2d 350, 357-58 (7th Cir. 1971) (possibility that a better-developed record of circumstances surrounding habeas petitioner's confession might have enabled state court to more competently determine whether his confession was voluntary was not per se a basis to convene hearing in federal court).

Although the record before the appellate court was limited and did not speak to a number of relevant considerations (for example, Gilbert's level of education and intelligence, and what exactly occurred during the nine- to ten-hour period in police custody that culminated in Gilbert's confession), what it did reveal suggested that Gilbert's confession was voluntary. Gilbert was questioned during daytime hours. As indicated by the confession itself, Gilbert was not mistreated. He was given

food, beverages, and access to a restroom. He was advised of his *Miranda* rights both at the time of his arrest and immediately prior to his confession; and in giving his statement, he acknowledged that he understood his rights and was making the statement of his own free will. All of these factors point toward the voluntary nature of the confession, and in the absence of other contrary evidence—be it of record or proffered by Gilbert in furtherance of his post-conviction petition—tends to support the Illinois Appellate Court's conclusion that the absence of Gilbert's mother during questioning did not alone suffice to render Gilbert's confession involuntary.

For the sake of completeness, we acknowledge that Gilbert did allege in his original post-conviction petition that while he was being questioned his mother had repeatedly asked for an attorney, R. 14 Ex. A; but Gilbert procedurally defaulted that allegation. Gilbert did not cite or rely on this allegation in his brief to the Illinois Appellate Court, R. 14 Ex. D, an omission that the State expressly cited in its own appellate brief, R. 14 Ex. E at 7. The Illinois Appellate Court, not surprisingly, did not address this possibility. Having failed to argue to the state appellate court that he was denied access to an attorney despite his mother's requests for one, Gilbert cannot rely on this allegation as a basis to challenge the state court's handling of his claim. *See Lewis v. Sternes*, 390 F.3d 1019, 1025-26 (7th Cir. 2004). Moreover, this allegation finds no support in the affidavit that his mother filed in support of his supplemental post-conviction petition. *See* R. 14 Ex. B at C20-C21.

In sum, the Illinois Appellate Court's holding as to the voluntariness of Gilbert's confession was neither contrary to, nor an unreasonable application of, federal law as determined by the Supreme Court of the United States. Gilbert's sole argument to the Illinois Appellate Court was that, in view of his age, the absence of his mother

during police interrogation rendered his ensuing confession involuntary. Yet, as the state court correctly noted, the absence of a parent by itself is not dispositive of the voluntariness of a juvenile's confession. Gilbert did not identify other circumstances calling into question the voluntary nature of his confession, and what the record otherwise revealed about Gilbert's characteristics and the circumstances surrounding the confession suggested that his confession was voluntary. Certainly one may question whether a juvenile as young as fourteen genuinely has the capacity to make an informed and voluntary decision to waive his rights without the guidance of an adult who has his interests at heart. But unless and until the Supreme Court breathes new life into its *Gallegos* decision and/or qualifies the standard it set forth in *Michael C.* for evaluating the voluntariness of juvenile confessions, our limited authority under the AEDPA does not permit us to say that a state-court finding of voluntariness like the one at issue in this case is unreasonable.

Having reasonably concluded that Gilbert's confession was voluntary, the Illinois Appellate Court acted consistently with Supreme Court precedent in concluding that Gilbert's ineffectiveness claim was without merit. Absent a finding that his confession was involuntary and therefore subject to suppression, Gilbert cannot show that his counsel's failure to file a motion to suppress was objectively unreasonable and therefore deprived him of the effective assistance of counsel. Moreover, Gilbert's case for prejudice presumes that his confession would have been suppressed on his counsel's motion and that this would have so weakened the State's case that he likely would not have pleaded guilty. The Illinois Appellate Court's reasonable determination that his confession was voluntary precludes him from establishing prejudice in this way. *See Cieslowski*, *supra*, 410 F.3d at 360.

**III.**

The district court correctly denied Gilbert's petition for a writ of habeas corpus. Gilbert's claim that his trial counsel was ineffective for failing to seek the suppression of his confession as involuntary required him to show, among other things, that his confession was in fact involuntary and would have been suppressed as such. However, the Illinois Appellate Court deemed his confession voluntary, and its decision in that regard was neither contrary to United States Supreme Court precedent nor derived from an unreasonable application of that precedent. The state court therefore reasonably concluded that Gilbert was unable to establish that he was prejudiced by his attorney's failure to seeking suppression of the confession. We thank Gilbert's appointed attorneys for their vigorous and conscientious advocacy on his behalf.

AFFIRMED.

A true Copy:

        Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*